REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 00315

September Term, 2016

_____

WOMEN FIRST OB/GYN ASSOCIATES, L.L.C.

v.

YOLANDA HARRIS

_____

Eyler, Deborah S.,
Reed,
Moylan, Jr., Charles E.,
(Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed: May 31, 2017

The primary question in this case is whether the voluntary dismissal with prejudice of a tort claim against an employee for no consideration and in the absence of a release bars the prosecution of the same claim against the employer based solely on vicarious liability. We hold that it does not.

## FACTS AND PROCEEDINGS

In the Circuit Court for Montgomery County, Yolanda Harris, the appellee, filed a one-count complaint for medical negligence against Women First OB/GYN Associates, LLC ("Women First"), the appellant, and LaKeischa McMillan, M.D., an obstetrician-gynecologist ("OB-GYN") employed by Women First.[1] Ms. Harris alleged that Dr. McMillan negligently performed a laparoscopic hysterectomy, causing an injury to her left ureter, and that Women First was liable for Dr. McMillan's negligence under the doctrine of *respondeat superior*. There was no claim of independent negligence against Women First. Women First and Dr. McMillan filed answers; they were represented by the same counsel.

Discovery proceeded and the case was set in for a jury trial to begin on December 7, 2015. On December 1, 2015, the parties filed a stipulation, signed by counsel, that Dr. McMillan was an "employee" of Women First and was "acting within the scope of her employment" "at all times while . . . treating [Ms. Harris][.]"

---

[1] Ms. Harris also sued C. Douglas Lord, M.D., the owner of Women First. She voluntarily dismissed her claim against him almost a year before trial.

The trial commenced as scheduled. At the very outset, before the venire was brought in, defense counsel told the court that "through some discussions just before trial we've decided to dismiss Dr. McMillan. So the only defendant would be [Women First.]"[2] The court responded, "Okay." In case the court had not seen it, defense counsel referenced the filed stipulation that Dr. McMillan had been acting within the scope of her employment at all relevant times. Nothing more was said about the dismissal of Dr. McMillan that day. Motions and jury selection took up the rest of the day.

At the beginning of the second day of trial, before the jury was brought in, the court clerk informed the judge that defense counsel "had a question about stipulation as to Defendant [Dr. McMillan]." Addressing counsel, the judge stated, "I'm told by [the clerk] that there's a question about the language of the stipulation regarding Dr. McMillan's portion being dismissed." Defense counsel responded that there was no written stipulation about that. Both counsel said the stipulation could be done "orally." Counsel for Ms. Harris then stated:

> So the plaintiff dismisses with prejudice the claims against Dr. Lakeischa McMillan . . . [i]ndividually. The stipulation is that at all times, she was acting as an employee, agent and servant of Women First . . . and that they are responsible for any actions of Lakeischa McMillan, M.D.

Counsel agreed that the jury would be instructed that Dr. McMillan was acting as an employee, agent, and servant of Women First. There was no ruling sought or made by

---

[2] This statement is transcribed in the record as having been made by defense counsel, although it is odd that he would frame the decision as having been made by him, as opposed to by counsel for Ms. Harris.

the court. A docket entry made that day states, however: "Plaintiff's oral motion dismisses the claims with prejudice as to defendant Lakeischa McMillan MD – Granted." There is no separate written order memorializing the court's ruling.

Ms. Harris testified that Dr. McMillan performed the laparoscopic hysterectomy on April 8, 2010. Unlike a traditional hysterectomy, in which the physician opens the patient surgically, a laparoscopic hysterectomy is performed by creating small incisions through which a laparoscope is inserted and used to carry out the procedure. Several days after the hysterectomy, Ms. Harris noticed fluid leaking from one of her incisions. The leaking stopped but sometime around April 21, 2010, when she had a follow up visit with Dr. McMillan, she began to experience discomfort when urinating and with bowel movements. These problems persisted and she also developed abdominal bloating and hardness. At the beginning of May 2010, her primary care physician referred her to a urologist.

The urologist diagnosed Ms. Harris with an injured left ureter, the tube-like structure that connects the left kidney to the bladder. The injury was causing urine to escape her left ureter and fill her abdomen. Ms. Harris was referred to radiologist Stephen Karr, M.D., at Holy Cross Hospital, to perform a pyelogram. From that study, Dr. Karr determined the location of the injury to the left ureter and placed a nephrostomy tube and collection bag, redirecting urine from the left kidney. The tube and bag remained in place for five and a half months, until the injury healed. Ms. Harris then underwent surgery to reattach her left ureter to her bladder.

Ms. Harris called Richard Luciani, M.D., an OB-GYN, and Barry Aron, M.D., a urologist, as expert witnesses. They testified that Dr. McMillan breached the standard of care in performing the laparoscopic hysterectomy, causing the injury to the left ureter and the need for subsequent treatment and surgery.[3]  We shall discuss the details of their testimony in addressing Question III.

At the close of Ms. Harris's case, Women First moved for judgment.  Defense counsel argued that the dismissal with prejudice of Ms. Harris's claim against Dr. McMillan operated as a release or an adjudication upon the merits in favor of Dr. McMillan; and because Dr. McMillan was "the sole agent for which Women[] First could be held vicariously liable[,]" there could be no liability against Women First as a matter of law.

Ms. Harris's lawyer responded that the dismissal with prejudice was not a release or an adjudication upon the merits.  The claim against Dr. McMillan simply was "drop[ped]" "without consideration," and the dismissal was not intended to extinguish Ms. Harris's claim against Women First.  He maintained that the dismissal along with the written stipulation that Dr. McMillan was acting as an employee of Women First and within the scope of her employment were "a culmination" of "discussions and negotiations" with defense counsel, who knew that Ms. Harris had no intention to

_____

[3] There was no criticism of any of the follow-up care rendered by Women First.

preclude liability on the part of Women First.[4]  Alternatively, he asked the court to exercise its revisory power under Rule 2-535 and "nunc pro tunc reinstate the claim against Dr. McMillan[.]"

In rebuttal, counsel for Women First argued that Ms. Harris's intent in dismissing Dr. McMillan with prejudice was not relevant; and the court did not have revisory power to reinstate her claim against Dr. McMillan.

The court directed counsel to submit written memoranda the next day in support of and opposition to Women First's motion for judgment.  Counsel did so.  In her opposition, Ms. Harris asked as an alternative that, if the court were inclined to grant the motion, it revise the dismissal to one without prejudice.

The court denied the motion on the morning of the following trial day.  It concluded that Ms. Harris's negligence claim against Women First remained viable even though she had dismissed her claim against Dr. McMillan with prejudice.  It noted that under Maryland law, Ms. Harris could have sued Women First under a theory of *respondeat superior* without suing Dr. McMillan at all.  It ruled that the voluntary dismissal with prejudice of Dr. McMillan was neither a release nor an adjudication upon the merits in favor of Dr. McMillan so as to preclude vicarious liability on the part of

---

[4] Dr. McMillan had filed for bankruptcy, but Ms. Harris's counsel had received approval from the bankruptcy court to lift the automatic stay, so long as any judgment against her were collected against her insurance only. Counsel nevertheless decided that it was not worth pursuing Dr. McMillan individually. As he pointed out, there was no settlement or consideration in exchange for dismissing the claim against Dr. McMillan.

Women First and found that Ms. Harris did not intend to foreclose her claim against Women First by dismissing her claim against Dr. McMillan.

The court went on the say that even though it had denied the motion for judgment and it was not necessary for it to exercise revisory power to change Ms. Harris's "motion to dismiss to one without prejudice[,]" it had the power to do so. It then proceeded to do so:

> I don't believe I need to [exercise revisory power] based on the ruling I've made, but so the record is clear, I do believe that I do still retain revisory power, because this was the plaintiff's action, it is not a judgment that has been entered, and it is an interlocutory proceeding, as I understand the statute and the case law, so that it is clear that this Court has found that the plaintiff's claim for respondeat superior does remain active, notwithstanding the action of the dismissal, which I believe was fully part of a negotiating discussion that was between plaintiff and defendant.
>
> I am going to exercise revisory power and amend [Ms. Harris's] motion to dismiss [Dr. McMillan] as a motion to dismiss without prejudice, because I do not believe that the facts in any way support [Ms. Harris's lawyer's] having endeavored to undermine the claim of [their] client as on the cusp of the trial beginning and was in response to the issue of if and when any judgment might be obtained and Dr. McMillan's ability to pay that judgment individually.

The court directed the clerk to enter a new, separate docket entry amending Ms. Harris's "motion to dismiss as to Dr. McMillan individually without prejudice[.]" That entry states:

> Court revises plaintiff's motion/stipulation at [previous docket entry] and is amended to dismiss as to Dr. McMillan individually without prejudice.

There was no written order dismissing Ms. Harris's claim against Dr. McMillan with or without prejudice.

In its case, Women First called Dr. McMillan, who defended her care, and three expert witnesses: Craig Dickman, M.D., an OB-GYN; Harry Johnson, M.D., an OB-GYN and urogynecologist; and Stanley Redwood, M.D., a urologist. As with Ms. Harris's experts, we shall discuss their testimony when we address Question III.

After Women First rested its case, it renewed its motion for judgment on the grounds previously asserted. The court denied the motion. Over objection, Ms. Harris's lawyer called Dr. Karr as a rebuttal witness.

The jurors returned a verdict in favor of Ms. Harris, finding that Dr. McMillan had negligently caused the injury to Ms. Harris's left ureter and that Women First was liable to Ms. Harris for Dr. McMillan's negligence. They awarded Ms. Harris $426,079.50 in damages.[5]

Women First filed a timely motion for judgment notwithstanding the verdict ("JNOV"), arguing, on the same grounds raised in its motion for judgment, that the case should not have been submitted to the jury.[6] Women First requested, in the alternative, a new trial. The parties filed several memoranda in support and opposition. The court held a hearing and issued an opinion and order denying the JNOV motion.

---

[5] The award was $62,292.19 for past medical expenses, $13,787.31 for past wage loss, and $350,000 in non-economic damages.

[6] Women First also filed a motion for remittitur to limit the damages awarded for past medical expenses to those actually paid by Harris. The motion was granted.

On appeal, Women First presents three questions, which we have rephrased as follows:[7]

> I.      Did the trial court err by denying Women First's motions for judgment and for JNOV?
>
> II.     Did the trial court abuse its discretion by revising Ms. Harris's motion to dismiss Dr. McMillan to be "without prejudice" rather than "with prejudice"?
>
> III.    Did the trial court err by permitting Ms. Harris to call Dr. Karr as a hybrid fact and expert rebuttal witness?

We answer these questions in the negative and shall affirm the judgment of the circuit court.

## DISCUSSION

## I.

Women First contends Ms. Harris's dismissal with prejudice of her negligence claim against Dr. McMillan discharged any vicarious liability of Women First, as a matter of law. It argues that, in Maryland, a voluntary dismissal with prejudice is an "adjudication [up]on the merits" in favor of the party being dismissed, and when that

---

[7] As worded by Women First, the questions presented are:

> I.      Whether appellee's voluntary dismissal with prejudice of Dr. McMillan, the agent, precluded appellee's vicarious liability claim as to appellant Women First, the principal, as a matter of law?
>
> II.     Whether the trial court abused its discretion by exercising revisory power to change appellee's voluntary dismissal with prejudice to a dismissal without prejudice?
>
> III.    Whether the trial court erred in permitting appellee to call and elicit factual and undesignated expert testimony from Steward Karr, M.D., as a rebuttal witness?

party is an employee, the dismissal precludes *respondeat superior* liability on the part of the employer. Therefore, Ms. Harris's voluntary dismissal of her claim against Dr. McMillan with prejudice foreclosed her claim against Women First, regardless of whether Ms. Harris intended that effect, and the court erred in denying its motions for judgment and JNOV.

Ms. Harris responds that when there is no claim of independent liability on the part of the employer, but only of liability under *respondeat superior* based on the employee's wrongdoing, a dismissal with prejudice of the claim against the employee without a settlement or exchange of consideration is not a release of claims or an adjudication upon the merits and therefore does not foreclose the plaintiff's claim against the employer.

Whether the court erred in denying Women First's motions for judgment and JNOV is a question of law that we review *de novo*. *Walter v. Gunter,* 367 Md. 386, 392 (2002) ("[W]here the order involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review.").

Under the doctrine of *respondeat superior*, an employer is vicariously liable for a tort committed by its employee while acting within the scope of his employment:

> Respondeat superior, or vicarious liability as it is also known, is a principle of tort law which "means that, by reason of some relationship existing between A and B, the negligence of A is to be charged against B, although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it."

*James v. Prince George's Cty,* 288 Md. 315, 332 (1980), *superseded by statute on other grounds*, as recognized in *Prince George's Cty v. Fitzhugh,* 308 Md. 384 (1987) (quoting W. Prosser, Handbook of the Law of Torts § 69, at 458 (4th ed. 1971)). As we explained in *Rivera v. Prince George's County Health Department.,* 102 Md. App. 456, 475–76 (1994), "[v]icarious liability is . . . the attribution of a wrongdoer's actions to an innocent third party by virtue of the relationship between the wrongdoer and the third party" so that, upon a showing of agency, there is not one, but two, sources of recovery.

It is settled law in Maryland that a plaintiff may sue an employer in tort based on the wrongful conduct of the employee, under *respondeat superior,* without suing the employee. *Blaen Avon Coal Co. v. McCulloh,* 59 Md. 403, 418 (1883) (stating that when agent commits tort while acting within the scope of his employment, "he and his employer may be sued separately or jointly, at the election of the injured party"); *see also Southern Mgmt. Corp. v. Taha,* 378 Md. 461, 482 (2003). In other words, the employee is not a necessary party. In the suit against the employer, the plaintiff need only prove that the employee committed the tort and did so while acting within the scope of his employment to establish the employer's liability. *Taha*, 378 Md. at 481–82

Thus far, the Maryland appellate courts have recognized two situations in which the resolution of a tort claim against an employee acting within the scope of his employment will preclude *respondeat superior* liability on the part of the employer: exoneration of the employee, *Southern Management Corp. v. Taha, supra*; and release of the employee, *Anne Arundel Medical Center, Inc. v. Condon,* 102 Md. App. 408 (1994).

In *Taha*, the plaintiff sued two employees of Southern Management Corporation ("SMC") for malicious prosecution and also sued SMC based solely on *respondeat superior*. A jury returned a special verdict *in favor* of the employees, finding that they did not commit the alleged wrong, but *against* SMC. The case reached the Court of Appeals, which reversed, holding that the verdict against SMC "[could not] stand" because it was "irreconcilably inconsistent" with liability under the doctrine of *respondeat superior. Id.* at 479. The Court explained that "a corporation without the capacity to exercise judgment" cannot be held liable based on *respondeat superior* "without evidentiary proof that one of its employees, acting within the scope of that person's employment duties, engaged in conduct sufficient to form a prima facie case of [the alleged tort]." *Id.* at 481 (citing *DiPino v. Davis,* 354 Md. 18, 48 (1999), for the proposition that "where liability is derivative, 'recovery may not be had against the entity if the employee is found not to be liable or is released'"). "[W]hen the jury has exonerated the co-defendant employees whose conduct was alleged to be the sole basis of the claim for liability[,]" the employer cannot be held liable vicariously. *Id.* at 486 (additional citations omitted).

In *Condon,* the plaintiff filed suit against a pathologist and the hospital that employed him, alleging that by negligently misreading tissue samples the pathologist failed to diagnose her breast cancer. Her claim against the hospital was based solely on *respondeat superior.* On the eve of trial, she entered into a settlement with the

pathologist, executing a release of all claims against him in consideration for the payment of $1 million dollars.[8] The release stated that it was not intended to release the plaintiff's claim against the hospital. The hospital, which did not consent to the settlement or the release, promptly moved for summary judgment, arguing that by operation of law the release of the plaintiff's claim against the pathologist released her vicarious liability claim against the hospital. The court denied the motion, and the case was tried against the hospital, resulting in a jury verdict for Condon.

The hospital appealed and we reversed. We explained that under the common law of agency, which prevails in Maryland, the release of an agent discharges his principal from liability. *Condon*, 102 Md. App. at 414. Also under the common law, when two or more tortfeasors jointly cause an injury to a plaintiff, the release of one joint tortfeasor releases them all. The latter common law rule has been superseded by the Maryland Uniform Contribution Among Tort-feasors Act ("UCATA"), however. Md. Code (1974, 2013 Repl. Vol.), § 3-1401 et seq. of the Courts and Judicial Proceedings Article ("CJP"). The UCATA provides that a plaintiff's release of a claim against one joint tortfeasor does not discharge the others from liability unless the release so provides, but reduces the plaintiff's claim against the remaining joint tortfeasors. CJP § 3-1404.

In deciding whether the release of the pathologist discharged the hospital from liability, we analyzed whether the defendants were joint tortfeasors, to whom the

---

[8] The pathologist had died and the settlement actually was with his estate. That made no difference in the outcome.

-12-

UCATA would apply, or were a principal and agent, to whom the common law of agency would apply. We concluded that they were not joint tortfeasors, who each are "actually independently at fault for their own wrongful acts." *Condon*, 102 Md. App. at 417. The hospital did not have any independent fault—its liability was based solely on the tortious conduct of the pathologist, with which it was in an agency relationship—and so they were a principal and agent. *Id.* at 416. *See also Chilcote v. Von Der Ahe Van Lines*, 300 Md. 106, 114 (1984) ("[W]here the liability of the master is vicarious, master and servant comprise but one 'pro rata share'" for purposes of the UCATA.).

"Absent independent wrongdoing by the principal, the release of an agent will also release the principal as a matter of law[,]" for, in that scenario, the release of the agent "removes the only basis for imputing liability to the principal." *Condon,* 102 Md. App. at 421. We explained:

> To hold otherwise would undermine the stated purpose underlying UCATA of promoting settlements among joint tortfeasors. *See Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 620 (1979), *rev'd on other grounds sub nom. General Motors Corp. v. Lahocki,* 286 Md. 714 (1980). It is unlikely that an agent would ever settle with a plaintiff if he still remained liable to indemnify his principal for any further amount the principal might be compelled to pay to the plaintiff. . . .
>
> If a plaintiff, under such a hypothetical legal scheme, were able to find an agent willing to settle, to allow the plaintiff to then proceed additionally against a vicariously liable principal would, in essence, permit the plaintiff "two bites out of the apple." If the principal could then seek indemnity from the agent, the agent's earlier settlement would be of little solace to him. Such a double exposure would act as a disincentive for agents ever to agree to a settlement.

*Id.* at 422–23.[9]  Because common law agency principles dictate that the release of a claim against the employee discharges the employer's vicarious liability for the employee's wrongdoing, the plaintiff's release of her claim against the pathologist discharged her claim against the hospital, as a matter of law, irrespective of her intent.  *See also Rivera*, 102 Md. App. at 477 ("[T]he release of an agent automatically release[s] the principal" under the common law, which remains unchanged in Maryland.).

In the case at bar, there was no jury trial in which Dr. McMillan was exonerated, as happened in *Taha*.  Quite the contrary, the jury found that Dr. McMillan *was* negligent, and returned its verdict against Women First on that basis.  And, unlike in *Condon*, Ms. Harris did not release her claim against Dr. McMillan, nor did she receive any consideration from Dr. McMillan for her dismissal with prejudice.  The question is whether the voluntary dismissal with prejudice operated as an "adjudication upon the merits" of the negligence claim against Dr. McMillan so as to have the same effect on the solely derivative claim against Women First as an exoneration or a release.  There is no Maryland case addressing this question.

Before analyzing the issue, we first review the process governing the voluntary dismissal of a claim in a civil action in the circuit court, which is set forth in Rule 2-

_____

[9] There was no mention in *Condon* of whether a dismissal with prejudice of the plaintiff's claim against the pathologist was filed.  Ordinarily, one would be.

506.[10]  All or part of a claim may be voluntarily dismissed without leave of court by filing a notice, before the adverse party files an answer, or by filing a stipulation signed by all the parties to the claim.  Md. Rule 2-506(a).  Otherwise, a claim only may be voluntarily dismissed by order of court, and the court has discretion over whether to allow the dismissal and over the "terms and conditions" of the dismissal.  Md. Rule 2-506(c).  Unless otherwise specified in the notice, stipulation, or order, a voluntary dismissal is without prejudice.  Md. Rule 2-506(d).  An exception exists when a party who previously has dismissed a claim without prejudice refiles the same claim and then files a second notice of dismissal.  *Id.*  In that circumstance, the notice of dismissal "operates as an adjudication upon the merits[.]"  *Id.*  The rule does not use the phrase "with prejudice" and does not otherwise expressly address the effect of a voluntary dismissal of a claim.

To support its position that Ms. Harris's voluntary dismissal with prejudice of her claim against Dr. McMillan was an "adjudication upon the merits" of that claim, and therefore had the legal effect of discharging the *respondeat superior* claim against Women First, Women First relies upon this Court's decisions in *Byron Laskey & Associates v. Cameron-Brown Co.,* 33 Md. App. 231 (1976), and *Bryan v. State Farm Mut. Auto. Ins.*, 205 Md. App. 587 (2012); the Supreme Court's decision in *Semtek*

---

[10] Unlike in the federal courts, in Maryland there is no separate rule governing *involuntary* dismissals of civil claims.  *See* Fed. R. Civ. Proc. 41(b) ("Involuntary Dismissal; Effect").  Rule 2-507 governs dismissals for certain instances of lack of jurisdiction or lack of prosecution.  The entry of dismissal under that rule is made by the clerk and is "without prejudice."  Md. Rule 2-507(f).

*International Inc. v. Lockheed Martin Corp.,* 531 U.S. 497 (2001); and several federal courts of appeal decisions.

In *Byron Laskey,* we addressed whether the circuit court was empowered to dismiss a claim with prejudice, under a predecessor to Rule 2-506, without having been asked to do so and without a hearing on the merits. General partners sued a lender for declaratory and injunctive relief to forestall foreclosure on a deed of trust. After injunctive relief was denied, they sought court approval to voluntarily dismiss their claims without prejudice, under former Rule 582. That rule required a party to obtain leave of court to voluntarily dismiss a claim and stated that the court's order "shall specify whether dismissal is with or without prejudice." 33 Md. App. at 232 (quoting former Md. Rule 582(a)). Over the general partners' objection and without a hearing on the merits, the circuit court dismissed their complaint *with prejudice*, not *without prejudice*.

In holding that the circuit court lacked authority to do so, we stated: "A dismissal with prejudice is a final adjudication and it is fundamental that an action can be finally adjudicated over objection of the plaintiff only after a hearing on the merits or through imposition of sanctions for default or conduct proscribed by law." 33 Md. App. at 234 (additional citations omitted). Women First seizes upon this language, but the case is distinguishable. It did not involve tort liability or vicarious liability, and given its procedural posture, the most our comment about a "final adjudication" can be taken to mean is that the dismissal of the general partners' claims with prejudice, precluding them from re-filing the same suit, had the same effect on them as a final adjudication of their

-16-

claims. The general partners could do nothing more to pursue relief. We did not say that the dismissal with prejudice was an adjudication upon the merits of the claims that were dismissed nor did we analyze the effect, if any, the dismissal with prejudice would have on anyone else.

In *Bryan,* we were concerned with the collateral estoppel effect of a verdict and settlement in a New York case on a Maryland case that shared a common party. A driver and passenger involved in an automobile accident sued Bryan, another driver involved in the same accident, in a New York court. The case was bifurcated and the jury returned a verdict against Bryan on liability. Before the damages phase of the trial began, the parties settled: Bryan paid $30,000, and the plaintiffs dismissed their claims with prejudice. Bryan then sued his uninsured motorist carrier in a Maryland court, claiming that the accident was caused by a phantom driver. The carrier moved to dismiss on the basis of collateral estoppel on the issue of liability. The circuit court granted the motion, and we affirmed.

We held that the New York jury's liability verdict against Bryan, combined with the settlement and dismissal of the claims against him with prejudice, which "operate[d] at a minimum, as a bar to further action on the same claim[,]" had preclusive effect against him in his claim against the carrier. 205 Md. App. at 603, 605. Clearly, in that case we were not addressing the effect, if any, of a voluntary dismissal with prejudice only, and in particular whether it operated as an adjudication upon the merits. We also were not addressing vicarious liability. We were addressing the effect of an actual adjudication upon the merits on the issue of negligence resulting in a verdict, but not a

judgment, followed by a settlement and dismissal with prejudice, on a later claim brought by the person whose negligence had been actually adjudicated. The case is not particularly helpful to our analysis for these reasons.

The Supreme Court's decision in *Semtek*, which involves *res judicata*, is somewhat helpful but, as we later shall explain, does not advance Women First's position. In *Semtek,* an action for inducement to breach a contract and various business torts was brought in a California state court and then was removed to a California federal district court based on diversity of citizenship. The defendant moved to dismiss on the ground that the claims were barred by California's two-year statute of limitations. The federal district court granted the motion and entered an order of involuntary dismissal, under Fed. R. Civ. Proc. 41(b), including (at the defendant's request) language that the dismissal was "'on the merits'" and "'with prejudice.'" 531 U.S. at 499.

Thereafter, the plaintiff brought the same claims against the same defendant in a Maryland circuit court, within Maryland's three-year statute of limitations. The defendant moved to dismiss on the ground of *res judicata*, arguing that the federal district court's involuntary dismissal of the claims was an adjudication upon the merits, which is an element of that defense. The circuit court granted the motion, and this Court affirmed. After the Court of Appeals denied a petition for writ of certiorari, the Supreme Court took the case.

The defendant advocated that Rule 41(b) gave the federal district court's dismissal order preclusive effect. That rule provides, with certain exceptions, that unless the court orders otherwise, an involuntary dismissal "operates as an adjudication upon the

merits."[11]  Fed. R. Civ. Proc. 41(b).  The Supreme Court observed that in the context of *res judicata*, an "adjudication upon the merits" ordinarily means an adjudication that "'pass[es] directly on the substance of [a particular] claim' before the court."  531 U.S. at 501-02 (quoting *Restatement (Second) of Judgments* § 19, Comment *a*, at 161 (1980)).  The meaning of "adjudication upon the merits" has gradually changed with time, however, often being applied to judgments that do not pass on the merits.  For example, the Court noted, the involuntary dismissal of a claim in one state court on the ground of that state's statute of limitations usually does not have preclusive effect when the same claim is brought in another state court that has a different statute of limitations.

In ascertaining the meaning of "adjudication upon the merits," the Court looked to Rule 41(a), which governs voluntary dismissals.  That rule "makes clear that an 'adjudication upon the merits' is the opposite of a 'dismissal without prejudice[.]'"  *Id*. at 505.  (Neither Rule 41(a) nor Rule 41(b) uses the "with prejudice" nomenclature.)  The Court determined that the "primary meaning of 'dismissal without prejudice'" in Rule 41(a) "is dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim."  *Id*.  So the only effect of the California federal district court's involuntary dismissal of the plaintiff's claims was to bar the plaintiff from refiling those same claims in that same court.  Its effect was not to operate as an adjudication upon the merits for purposes of *res judicata*.

---

[11] The exceptions are for involuntary dismissals for lack of jurisdiction, improper venue, and failure to join a necessary party.  Fed. R. Civ. Proc. 41(b).

Ultimately, the Court decided that the claim preclusion effect of an involuntary dismissal by a federal district court sitting in diversity is a matter of federal common law; and because "state, rather than federal, substantive law is at issue there is no need for a uniform federal rule." 531 U.S. at 508. To discourage forum shopping in the federal courts, the Court adopted "as the federally prescribed rule of decision . . . the law that would be applied by state courts in the State in which the federal diversity court sits[,]" unless incompatible with federal interests. *Id*. at 508–09. Thus, the claim preclusion effect of the California federal district court's dismissal "'upon the merits' of [the] action on statute-of-limitations grounds is governed by a federal rule that in turn incorporates California law of claim preclusion[.]" *Id.* at 509. The Court reversed, remanding the case for the Maryland circuit court to make that decision.

For our purposes, *Semtek* stands for the proposition that an "adjudication upon the merits" may not have the same meaning procedurally as it does substantively. An order that is an adjudication upon the merits under Rule 41(b), so as to prevent the same plaintiff from re-filing the same claim in the same court, is not necessarily an adjudication upon the merits for preclusive effect, as an element of the substantive law of the defense of *res judicata*. In other words, context matters. We shall keep this in mind as we consider the cases Women First cites to support its position that the dismissal with prejudice of Ms. Harris's claim against Dr. McMillan precluded her from recovering against it based on *respondeat superior* and the cases Ms. Harris cites for the opposite position.

-20-

Women First places greatest reliance upon *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F. 2d 530 (4th Cir. 1991). There, the plaintiff brought suit in a North Carolina state court against her former supervisor (Walls), for battery and intentional infliction of emotional distress, and against their former employer (Edison), for those torts under *respondeat superior*. She also included direct claims against Edison for wrongful discharge and negligent retention. Edison removed the case to federal court based on diversity jurisdiction. Walls filed a counterclaim for intentional infliction of emotional distress.

Thereafter, the plaintiff and Walls entered into a settlement by which each agreed to voluntarily dismiss his/her claim against the other "with prejudice," by stipulation. Edison did not know about the stipulation until it was filed. Upon learning of it, Edison moved for summary judgment on the claims against it, arguing that the plaintiff's dismissal with prejudice of her claims against Walls precluded her from recovering against it on those claims, as any liability it could have on those claims was solely derivative. The court granted the motion as to the derivative battery and intentional infliction of emotional distress claims, but denied the motion as to the direct claim of negligent retention. It also granted a motion to dismiss the wrongful discharge claim and certified that there was no just reason to delay for purposes of appeal.

The Fourth Circuit affirmed the district court's grant of summary judgment in favor of Edison on the battery and intentional infliction of emotional distress claims. (It reversed on the wrongful discharge claim). It reasoned that "[a] voluntary dismissal with prejudice under Fed. R. Civ. P. 41(a)(2) [*i.e.*, by stipulation] is a complete adjudication

-21-

on the merits of the dismissed claim." *Id.* at 534 (additional citations omitted). "*Therefore, Walls has been adjudicated not liable for battery or intentional infliction of emotional distress.*" *Id.* (emphasis added). Because, under the substantive law of North Carolina, which applied, "[t]he exoneration of an employee/agent is fatal to a vicarious claim against an employer/principal[,]" there was no liability that could be imputed to Edison. *Id.* (additional citations omitted).[12]

The *Harrison* court primarily relied upon three cases in reaching its decision. Interestingly, they all are cases in which dismissals with prejudice were given by plaintiffs in consideration for payment by settling defendants. In *Citibank, N.A. v. Data Lease Financial Corp.*, 904 F. 2d 1498 (11th Cir. 1990), a borrower filed a counterclaim against a bank and a third party claim against seven of the bank's directors. The counterclaim against the bank was based solely upon the alleged wrongdoing of the directors. The borrower settled its claims against the directors for $1 million dollars and dismissed them "with prejudice," in an order entered pursuant to Rule 41(a). The bank moved for summary judgment on the borrower's counterclaim, arguing that its only liability was derivative of the liability of the directors, and the borrower's dismissal of its claims against the directors with prejudice was an adjudication upon the merits that barred the borrower's counterclaim against it.

---

[12] One of the judges on the *Harrison* panel dissented, but did not write a dissenting opinion; therefore it is impossible to tell whether that judge was dissenting on one issue or both, and if on one issue, which issue.

The district court agreed, and the Eleventh Circuit affirmed on appeal. Applying Florida's substantive law of agency, that "'a principal cannot be held liable if the agent is exonerated,'" *id.* at 1500 (quoting *Bankers Multiple Life Ins. Co. v. Farish*, 464 So. 2d 530, 532 (Fla. 1985)), the court held that the "dismissal of a complaint with prejudice satisfies the requirement that there be a final judgment on the merits[,]" and therefore the voluntary dismissal with prejudice was a final adjudication of the borrower's counterclaim against the bank. *Id.* at 1501.[13]

In *Brooks v. Barbour Energy Corp.*, 804 F.2d 1144 (10th Cir. 1986), also relied upon by the *Harrison* court, the Tenth Circuit held that the voluntary dismissal with prejudice of claims by the plaintiffs, as part of a comprehensive settlement that resolved the substance of the disputed claims, was a judgment on the merits, with *res judicata* effect. Finally, the *Harrison* court cited *Schwarz v. Folloder*, 767 F.2d 125, 129 (5th Cir. 1985), for the proposition that a dismissal with prejudice under Rule 41(a) is an adjudication upon the merits. The issue in that case, and in the case the Fifth Circuit quotes for that proposition—*Smoot v. Fox*, 340 F. 2d 301, 303 (6th Cir. 1964)—was whether a trial court abused its discretion by granting a plaintiff's motion to voluntarily dismiss his claims with prejudice, not the effect of such a dismissal on others.

---

[13] The settlement agreement had provided that it would not impair the borrower's counterclaim against the bank, which had not agreed to the settlement. The court noted that the counterclaim could have been saved had the bank consented, but without that happening, the borrower's mere intention to save its counterclaim against the bank did not accomplish that purpose.

Some state courts have held that the dismissal of a claim against a defendant is an adjudication upon the merits equal to an exoneration, so the defendant's principal cannot be held vicariously liable, even when there has been no settlement, release, or exchange of consideration. In *Law v. Verde Valley Medical Center*, 217 Ariz. 92 (2007), the plaintiff's decedent suffered head injuries in a fall at the defendant medical center. The plaintiff sued two doctors for negligently failing to diagnose the decedent's head injuries and the medical center for vicarious liability based on the tortious conduct of the two doctors and for vicarious liability based on the tortious conduct of unnamed emergency room personnel in creating the situation in which the decedent fell. Before trial, the plaintiff voluntarily dismissed both doctors with prejudice. One was dismissed in conjunction with a settlement; the other was dismissed "in the absence of any settlement payment or release." 217 Ariz. at 96 n.2. The medical center moved for summary judgment on the vicarious liability claims that were based on the doctors' negligence, and the motion was granted. The rest of the case went to trial, and the medical center prevailed before a jury.

The plaintiff appealed, arguing that the trial court erred in ruling that the dismissal with prejudice of the claims against the doctors precluded the medical center from being held vicariously liable for their negligence. The Supreme Court of Arizona affirmed, holding that because "a dismissal with prejudice" is the equivalent of a "judgment on the merits[,]" there was "no fault [on the part of the doctors] to . . . impute [to the party potentially vicariously liable[,]" *i.e.*, the medical center. *Id*. at 96. Most of the court's discussion was an explanation of why Arizona's UCATA was not relevant to the question

-24-

of a principal's vicarious liability for the acts of its agent. The court stated that even in the absence of a release, the dismissals with prejudice "constitute[d] adjudications of non-liability on the merits" for the doctors. *Id*. (additional citation omitted). *See also Medeiros v. Middlesex Ins. Co.,* 48 Mass. App. Ct. 51 (1999) (holding that voluntary dismissal with prejudice of negligent misrepresentation claim against insurance agent precluded vicarious liability on the part of the insurance company principal); *Barnes v. McGee*, 21 N.C. App. 287, 289 (1974) (holding that voluntary dismissal with prejudice of negligence claim against employee, apparently without consideration of any sort, was a "judgment on the merits . . . [that] precludes any action against the employer where . . . the employer's liability is purely derivative"). *Cf. Sisk v. J.B. Hunt Transport, Inc.*, 81 P.3d 55 (Okla. 2003) (second dismissal of negligence claim against driver, which by rule prevented plaintiff from suing him again, precluded claim for vicarious liability of driver's employer).

The issue before us is not one on which there is uniformity across the country, however. Ms. Harris cites several cases in which state courts have held that, absent a settlement in which consideration is paid, a voluntary dismissal with prejudice of an employee defendant is not an adjudication upon the merits of the claim against him so as to preclude prosecution of the same claim against the employer under *respondeat superior*.

In *Brosamle v. Mapco Gas Products, Inc.*, 427 N.W.2d 473 (Iowa 1988), the plaintiffs sued a propane gas company and its employee for injuries they sustained in a propane gas explosion. They alleged that the employee had negligently overfilled their

tank and the company was liable for his negligence as his employer. When the plaintiffs realized that the employee was "essentially judgment proof," they dismissed their claim against him without prejudice. 427 N.W.2d at 474. The company then sought to remove the case to federal court on diversity grounds.

During that attempt, which ultimately was unsuccessful, the plaintiffs agreed to voluntarily dismiss their claim against the employee *with* prejudice as a gesture of good faith to show they had no interest in pursuing separate litigation against him. After remand to state court, the plaintiffs filed a dismissal of the claim against the employee with prejudice. The dismissal stated the plaintiffs' intention was not to dismiss their claims against the company-employer. After the close of plaintiffs' case, the company moved for a directed verdict, arguing that the dismissal with prejudice of its employee was an adjudication upon the merits in favor of the employee that was the equivalent of an exoneration. The court denied the motion. The jury returned a verdict in favor of the plaintiffs.

The Iowa Supreme Court affirmed, even though its controlling court rule stated that "'[a]ll dismissals . . . shall operate as adjudications on the merits unless they specify otherwise.'" *Id.* at 475 (quoting Iowa Rule of Civil Procedure 217). The court noted that the employee had not been a necessary party, because under the common law of agency the servant or the master or both could be held liable for the servant's wrongdoing. Therefore, suit could have been brought against the company for the employee's negligence without the employee being included as a party. It also noted that the

dismissal with prejudice of the employee was filed without a settlement or any determination of the employee's fault. The court held:

> Where, as here, the employee is not a necessary party to an action against an employer, dismissal of the employee will not be construed as an adjudication on the merits of the employee's fault (and, hence, the employer's liability) unless the dismissal expressly so provides.

*Id*. at 476.

The *Brosamle* court found persuasive the decision of the Supreme Court of Montana in *Cantrell v. Henderson*, 718 P.2d 318 (Mont. 1986), in which it moved away from its "rigid dismissal with prejudice rule." 427 N.W.2d at 476. In *Cantrell*, the plaintiffs sued a truck driver and his trucking company employer for negligence, seeking damages for injuries sustained in an accident. There was no claim of independent liability against the trucking company. The plaintiffs decided to dismiss their claim against the driver without any consideration and moved the court for an order of dismissal. The trucking company responded that it had no objection so long as the order dismissed the claim against the driver with prejudice. Such an order was entered.

The trucking company then moved for summary judgment on the ground that the effect of the dismissal with prejudice of its driver was to preclude it from being held liable for the driver's conduct based on *respondeat superior*. The court granted the motion, and the plaintiffs appealed. The Montana Supreme Court reversed. Acknowledging that there was a split of authority on the issue, it stated:

> We conclude that the better rule is that dismissal of a defendant "with prejudice" does not release other defendants who may be liable under a theory of *respondeat superior*, unless the document intends to do so, or the payment is in full compensation, or the release expressly so provides. This .

. . reflects the tactical reality of dismissals of less than all defendants in multi-party tort litigation. It also reflects the inappropriateness in modern practice of an interpretation which finally disposes of substantive issues based on a technical misstep by counsel.

718 P.2d at 321.

Much more recently, in *Hughes v. Doe*, 273 Va. 45 (2007), the Supreme Court of Virginia took a similar approach in deciding the effect of a dismissal with prejudice of an employee on an employer sued based on *respondeat superior*. The plaintiff brought a medical malpractice action against a medical center and its employee, who was designated "Jane Doe" in the complaint because her identity was not known when suit was filed. After the plaintiff learned the employee's identity, she moved to amend her complaint to substitute the employee for "Jane Doe." The medical center opposed the motion on the ground that the claim against the employee was time-barred. The court allowed the amendment but, ruling that the amended complaint did not relate back to the original complaint, entered an order dismissing the employee with prejudice based on limitations. The medical center filed a motion for summary judgment, arguing that the dismissal with prejudice of the claim against the employee precluded liability on its part. The court granted the motion.

Over the dissent of two justices, the Virginia Supreme Court reversed. It acknowledged that it previously had held that a dismissal with prejudice is an "'adjudication on the merits, and final disposition, barring the right to bring or maintain an action on the same claim or cause[.]'" 273 Va. at 48 (quoting *Reed v. Liverman*, 250 Va. 97, 99–100 (1995)) (internal quotations omitted). It explained, however, that it never

had held that the dismissal of a claim against an employee with prejudice precluded the same claim against the employer based on *respondeat superior* when the dismissal was merely a matter of procedure. Such a dismissal with prejudice is not the same as a decision on the merits, *i.e.*, a finding that the employee was not negligent. For that reason, the "derivative liability principle"—that the exoneration of the employee by a finding of non-negligence exonerates the employer on the same claim—did not apply, *id*:

> In this case, the dismissal with prejudice of [the employee] was not an affirmative finding of non-negligence; it merely terminated [the plaintiffs'] ability to hold [the employee] liable for any alleged negligence. To conclude that the dismissal with prejudice in this case terminates [the plaintiff's] ability to pursue a claim against [the employer], in the absence of any finding that [the employee] was not negligent, goes well beyond our established jurisprudence.

*Id*. at 49 (footnote omitted). *See also Hedquist v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 272 Ga. 209, 210 (2000) (holding that dismissal with prejudice of employee is not an adjudication upon the merits and therefore does not preclude *respondeat superior* liability finding against employer); *Indemnity Ins. v. City of Garland*, 258 S.W. 3d 262, 272 (Tex. App. 2008) (under common law, dismissal with prejudice of employee, without settlement, was not a prior adjudication against the employee so as to bar claims against employer under collateral estoppel).[14]

---

[14] Under New York statutory law, the release of a tort claim against an agent does not release the principal for vicarious liability, *Riviella v. Waldron*, 47 N.Y.2d 297, 307 (1979); and in *Pace v. Hazel Towers, Inc.,* 584 N.Y.S.2d 22 (N.Y. App. Div. 1992), the New York Appellate Division, First Department held that because by statute there is no preclusive effect when the agent is released, there should be no preclusive effect when the agent is dismissed with prejudice.

In a similar vein, some courts have held, consistent with the observations of the Supreme Court in *Semtek*, that a dismissal with prejudice of a claim against an employee entered on a procedural ground, such as limitations, is not an adjudication upon the merits against the employee that bars the employer from being adjudicated vicariously liable even when the dismissal is involuntary, not voluntary. For example, in *Cohen v. Alliant Enterprises, Inc.*, 60 S.W. 3d 536 (Ky. 2001), the plaintiff sued a doctor and an emergency care center that employed him for medical negligence. The claim against the center was based solely on vicarious liability. The plaintiff later realized that the doctor he had sued was not the one who had treated him; he had been treated by another doctor at the same center. He filed an amended complaint, "dismissing [the doctor] and leaving [the center] as the only defendant." *Id.* at 537. He could not add the doctor who actually treated him as a defendant because limitations had run on that claim. The center moved for summary judgment on the ground that because the claim against the treating doctor was time-barred, the center could not be held liable vicariously for the treating doctor's negligence. The court granted the motion.

The case reached the Kentucky Supreme Court, which reversed. It drew a contrast between the case before it and *Copeland v. Humana of Kentucky, Inc.*, 769 S.W. 2d 67 (Ky. Ct. App. 1989). In *Copeland*, a child suffered brain damage from the improper administration of anesthesia during eye surgery. Through his parents, he entered into a settlement agreement or covenant not to sue with the anesthesiologist, receiving compensation and agreeing not to sue the anesthesiologist. He then sued the hospital, based on *respondeat superior* and also for independent negligence. The court granted

partial summary judgment in favor of the hospital on the vicarious liability claim. In affirming, the Kentucky Court of Appeals stated: "Having agreed not to sue the servant/agent, and made recovery by settlement therefrom, the [plaintiff] may not now seek additional recovery from the master/principal based upon the same acts of alleged negligence, whether the document is called a 'release' or 'covenant not to sue.'" *Id.* at 69.

The *Cohen* court explained the difference between the case before it and *Copeland:*

> The case at bar is clearly distinguishable from *Copeland*, in that there has been no settlement of any sort here. The Copelands were able to recover for the negligence of the anesthesiologist/agent via the "release" or "covenant not to sue" and therefore, the vicarious liability of the hospital for the negligent actions of its agent could not serve as a second recovery for the same offending conduct. *The fact that Mr. Cohen cannot recover from the agent here does not negate the fact that liability may exist, and that it can be imputed to the principal. It is the negligence of the servant that is imputed to the master, not the liability. "The test as to the liability of the master is whether the servant was guilty of negligence. . . ."*

60 S.W. 3d. at 538 (quoting *Horne v. Hall*, 246 S.W. 2d 441, 443 (Ky. 1951)) (emphasis added).

Having considered the spectrum of relevant cases from around the country, we are persuaded that the better view is that the dismissal with prejudice of a tort claim against an agent does not necessarily have the effect of rendering the vicarious liability claim against the agent's principal non-viable. Specifically, when the dismissal with prejudice of the agent is not given in exchange for consideration and the merits of the tort claim against the agent have not actually been adjudicated before the dismissal, neither sound

legal principles nor the policy underlying *respondeat superior* supports the conclusion that the dismissal with prejudice eliminates any vicarious liability on the part of the principal.

As we explained in *Condon*, in an agency relationship, the doctrine of *respondeat superior* operates to impose liability upon the principal for the agent's tortious conduct committed within the scope of the agency; therefore, a finding that the agent committed a tort is a necessary predicate for the principal to be held liable. To obtain a judgment against the principal, however, the plaintiff need not *sue* the agent and the agent need not be held liable individually. It is sufficient that the plaintiff sue the principal and put on evidence proving the agent's tortious conduct. If the fact-finder determines that the agent committed a tort and did so while acting within the scope of the agency, the principal will be liable.

Because the liability of the principal is wholly derivative, that is, it is a function of status and stems entirely from the tortious conduct of the agent, not from any tortious conduct by the principal, there only can be one recovery, regardless of whether both are sued or only the principal is sued. *Cf. Chilcote v. Von Der Ahe Van Lines, supra*. And, as in *Condon*, the plaintiff's release of her tort claim against the agent necessarily precludes the imposition of liability against the principal. A plaintiff who executes a release acts "affirmatively and purposefully to *extinguish* the underlying claim." *Mummert v. Alizadeh*, 435 Md. 207, 221-22 (2013) (emphasis added). Once the plaintiff's claim against the agent is extinguished, there no longer is any tortious conduct by the agent that the principal is responsible for.

-32-

Releases are bilateral contracts supported by consideration flowing between the parties. *Kaye v. Wilson-Gaskins*, 227 Md. App. 660, 679 (2016) ("'Releases are contractual, and they are therefore governed by ordinary contract principles.'") (quoting *Chi. Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md. App. 538, 548 (1998)). It is usual that the release by a plaintiff of her claim against a defendant, which is a thing of value, will be given in exchange for a thing of value, ordinarily money, given by that defendant. When a principal's potential liability in tort derives solely from the tortious conduct of his agent, as is the case when the doctrine of *respondeat superior* applies, it makes sense to treat the release of the agent as if it were an adjudication upon the merits in his favor and therefore in favor of the principal. Otherwise, the plaintiff could pursue the principal and potentially recover twice for a single wrong. [15]

In the absence of an actual exoneration of the agent (such as in *Taha*), a release of the plaintiff's claim against the agent (such as in *Condon*), or a settlement of some sort in which the agent has compensated the plaintiff in consideration for being dismissed with prejudice (which ordinarily would be accompanied by a release), there is no well-founded

---

[15] It is telling that in many of the cases holding that the dismissal with prejudice of an agent defendant will preclude a finding of vicarious liability against the remaining principal defendant the plaintiff received value in consideration for the dismissal. Double recovery is not a concern when a plaintiff dismisses with prejudice a claim against a defendant (whether or not an agent) without receiving any consideration for the dismissal. *See e.g. Citibank*, *supra* (dismissal of agent was in consideration for payment to plaintiff of $1 million); *Brooks v Barbour Energy Corp., supra* (dismissal of agent was in consideration for comprehensive settlement). Even in *Harrison*, on which Women First places most reliance, there was some value exchanged, in that the dismissal with prejudice of the plaintiff's co-employee was given in consideration for his dismissal of his counterclaim against her.

reason to treat the dismissal of the agent with prejudice as an adjudication upon the merits of the claim against him. The risk of double recovery is not a concern because the plaintiff has not received anything of value. The dismissal with prejudice is simply the procedural mechanism to permanently remove the agent as a defendant in the case when it was not necessary to include him as a defendant in the case to begin with. It is not "an affirmative finding of non-negligence[,]" *Hughes*, 273 Va. at 49, as there is no substantive determination underlying it. And the purpose behind the doctrine of *respondeat superior*—to ensure that upon a showing of agency there will be two sources of recovery instead of one—certainly would be defeated by treating the procedural dismissal with prejudice as if it were a substantive finding of no negligence, thus reducing the plaintiff's sources of recovery from two to none.

To be sure, in Maryland, the dismissal with prejudice of any defendant, including an agent, bars the plaintiff from bringing a second action against that defendant on the same claim, *Roane v. Washington County Hospital,* 137 Md. App. 582, 590 (2001), at least in the same court. *Cf. Semtek*, *supra*. In a case where there is but one defendant, the dismissal with prejudice of the plaintiff's claim may have the same *res judicata* effect as if there had been a final adjudication upon the merits in favor of the defendant. *See, e.g., Claibourne v. Willis,* 347 Md. 684, 692 (1997). Our concern is with the effect of a dismissal with prejudice of one defendant, an agent, on a second defendant, his principal, however. In that context, when the alleged wrongful conduct of the agent is still open for determination by the fact-finder in the action against the principal, it is immaterial that

the plaintiff is barred from bringing a second action against the agent. (Indeed, if it were material, the plaintiff could not recover from the principal without suing the agent.)

The legal effect of a dismissal with prejudice of an agent on his principal should be guided by whether the dismissal is a procedural device used to drop the agent as a defendant or has a substantive basis, such as an adverse decision on the merits, the release of the plaintiff's claim, or an exchange of value. In this case, the dismissal with prejudice simply removed Dr. McMillan from the case, without more. Had the parties intended that her removal would preclude Ms. Harris from pursuing her claim against Women First, they could have stated so expressly. (It is obvious that that would not have happened, however.) Otherwise, the legal effect of Ms. Harris's voluntary dismissal with prejudice of her claim against Dr. McMillan was not to preclude her from continuing to pursue her *respondeat superior* claim against Women First. That claim remained viable. Accordingly, the trial court did not err in denying Women First's motion for judgment or motion for JNOV.

## II.

Women First's second contention concerns the trial court's exercise of revisory power to convert what it termed Ms. Harris's "motion to dismiss" her claim against Dr. McMillan from a dismissal "with prejudice" to a dismissal "without prejudice." It argues that Ms. Harris never moved to dismiss her claim against Dr. McMillan; rather, she presented the court with a stipulation of dismissal that was approved by the parties. It further asserts that any revisory power the court had was governed by Rule 2-535(b) and that Ms. Harris did not file a written motion, which must be done for the court to exercise

its revisory power under that rule. Finally, it maintains that even if Ms. Harris had filed such a motion, she was not entitled to relief under that rule.

Ms. Harris responds that the court properly exercised its discretion to revise her motion to dismiss to one without prejudice under Rule 2-602(a) because there was no final judgment at the time.

The proceedings central to this issue, which we have described above, are not a model of clarity. Counsel for Ms. Harris did not file a stipulation of dismissal signed by Ms. Harris and by Dr. McMillan. *See* Md. Rule 2-506(a). He presented an oral stipulation, with which counsel for Dr. McMillan agreed; and did not expressly request leave of court to voluntarily dismiss the claim. *See* Rule 2-506(c). From the wording of the docket entries, however, it seems that the court treated the oral stipulation as a motion for leave to dismiss the claim against Dr. McMillan with prejudice, which it "[g]ranted."

After Women First moved for judgment at the close of Ms. Harris's case and the court called upon the parties to file memoranda, Ms. Harris's counsel asked as an alternative form of relief (if the court were inclined to grant the motion for judgment) that the dismissal with prejudice already "[g]ranted" by the court be revised to a dismissal without prejudice. In ruling on the motion for judgment, the court expressly determined that the dismissal with prejudice of the claim against Dr. McMillan did not insulate Women First from liability. It also granted the alternative relief, however. The court did not prepare a written order of dismissal, with or without prejudice.

The contention Women First advances lacks merit for several reasons. First, we have affirmed the court's primary ruling, that Ms. Harris's dismissal with prejudice of her

-36-

claim against Dr. McMillan did not compel the entry of judgment in favor of Women First as a matter of law. So, whether the court abused its discretion by revising the "motion to dismiss" from one with prejudice to without prejudice is of no consequence. Without any revision by the court, the ruling on the motion for judgment was correct and the case against Women First properly proceeded to the jury for decision.

Second, Rule 2-535(b) is completely irrelevant. It governs the court's power, in a civil case, to revise a final judgment more than 30 days after the judgment was entered. In a civil case against multiple parties, there can be no final judgment until the claims by and against all parties have been adjudicated. Md. Rule 2-602(a)(1).[16] When the revision that Women First complains about was made, the claim against it was not yet adjudicated, so there was no final judgment, let alone an enrolled final judgment. At most, the court was revising its interlocutory oral ruling approving the dismissal with prejudice of the claim against Dr. McMillan only, which means it was acting under Rule

---

[16] As pertinent here, Rule 2-602(a) states:

[A]n order or other form of decision, however designated . . . . that adjudicates the rights and liabilities of fewer than all the parties to the action: (1) is not a final judgment; (2) does not terminate the action as to any of the claims or any of the parties; and (3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

2-602(a)(3), and therefore had full revisory power. *See also Baltimore Police Dept. v. Cherkes,* 140 Md. App. 282, 301 (2001).[17]

We are left with a finality issue to address, however, in that there is no separate document pertaining to the claim against Dr. McMillan, as required by Rule 2-601(a). Indeed, there is no document at all. In *Hiob v. Progressive American Ins. Co.*, 440 Md. 466, 487 (2014), where the plaintiff and one defendant signed a voluntary stipulation of dismissal of the claim against that defendant and filed it in court, the Court of Appeals held that the separate document requirement of Rule 2-601(a) was not satisfied. The Court explained that "a voluntary dismissal by stipulation, which is not presented to the court for approval is not an order of court and therefore is not a judgment." *Id.* at 488. Thus, if counsel for Ms. Harris and Dr. McMillan had signed and filed a voluntary stipulation of dismissal of the claim against Dr. McMillan (with or without prejudice), the separate document requirement would not have been satisfied.

We think it plain that the trial court granted leave for Ms. Harris to voluntarily dismiss her claim against Dr. McMillan with prejudice and then, as a fall back to its ruling on the motion for judgment, without prejudice. Docket entries were made of these rulings. Nevertheless, there never has been a document signed either by the court or by the clerk of court memorializing these rulings and therefore constituting a final judgment under Rule 2-601(a). As the Court of Appeals recently explained, however, the separate

---

[17] Women First relies upon *Claibourne v. Willis*, 347 Md. 684 (1997), to support its argument that Rule 2-535(b) applied. That case is inapposite because there was a final judgment.

document requirement may be waived "in order to *preserve* an appeal, rather than eliminate it as untimely." *URS Corp. v. Fort Myer Constr. Corp.*, Slip. Op. No. 31, September Term 2016, at 19 (filed March 24, 2017) (emphasis in original). In particular, when there is a docket entry of the court's ruling; the court's failure to memorialize its ruling in a separate document was inadvertent; the parties have not objected to the fact that a separate document was not prepared; and remanding the case merely for the court to prepare and enter the document would accomplish nothing but delay, waiver is appropriate. In the case at bar, the waiver doctrine applies, and there was a final judgment when the appeal was noted by Women First.

### III.

Finally, Women First contends the trial court abused its discretion by allowing Ms. Harris to call Dr. Karr as a rebuttal witness. We disagree.

In Ms. Harris's case-in-chief, Dr. Luciani (her OB-GYN expert) opined that Dr. McMillan breached the standard of care by failing to adequately protect the left ureter from damage during the hysterectomy. He explained that in removing the uterus the physician cauterizes and severs the left uterine artery, which crosses over the left ureter. To do so in this case, Dr. McMillan used a "harmonic scalpel," which is a surgical instrument that coagulates blood and also cuts tissue by means of jaw-like appendages and friction-generated heat. The harmonic scalpel is capable of burning tissue within a 3 millimeter radius. Dr. Luciani opined that Dr. McMillan failed to properly locate Ms. Harris's left ureter and use appropriate techniques to move it a safe distance from where she was applying the harmonic scalpel to sever the left uterine artery. As a consequence,

she caught the left ureter in the jaws of the harmonic scalpel, or within its burn radius, damaging it at the level where the left uterine artery crossed it.

Dr. Aron, Ms. Harris's urology expert, testified in greater detail about the cause of the injury to Ms. Harris's left ureter. He reviewed the pyelogram Dr. Karr performed and read the images as showing an "obstruction" and leak in the left ureter "at the level of the uterine artery." He opined that the obstruction and leak were created when Dr. McMillan "clamped" the left ureter "in the tip of the harmonic [scalpel]" while severing the left uterine artery, both "burn[ing]" and "cut[ting]" the left ureter.

These expert witnesses testified on December 8 and 9, 2015, respectively. On the night of December 9, 2015, counsel for Women First took the *de bene esse* deposition of Dr. Redwood, its own urology expert, for use at trial.

On December 10, 2015, Women First called Dr. Dickman, its OB-GYN expert, who opined that Ms. Harris sustained a delayed-onset injury caused by a disruption of the blood supply to the left ureter during the hysterectomy, which would have been undetectable at the time of surgery.

Women First then called Dr. Johnson, its urogynecology expert. Before Dr. Johnson could testify regarding the pyelogram performed by Dr. Karr, and before Women First played Dr. Redwood's *de bene esse* deposition, Ms. Harris's counsel objected to their testimony. He argued that they were about to opine that the injury to Ms. Harris's left ureter was in fact located in a lower area on the ureter and that that location suggested that Dr. Karr caused the injury in the course of performing the pyelogram, which was an entirely different opinion than the one they had expressed in

-40-

their pre-trial depositions. (Their prior opinion had been in accordance with Dr. Dickman's opinion.) He complained that Ms. Harris had not been given any prior notice of this change in the defense experts' opinion. [18]

Ms. Harris's counsel moved the court *in limine* to restrict Drs. Johnson and Redwood to giving the opinion they originally expressed in pre-trial depositions and to prohibit them from opining that Dr. Karr had caused the injury to Ms. Harris. He conceded that he did not provide the pyelogram images to defense counsel until after Drs. Johnson and Redwood had given their pre-trial depositions and that they were entitled to change their opinions based on the new material. He maintained, however, that defense counsel was obligated to notify him in the event of such a change, which he did not do. He further directed the court's attention to a letter he had sent to defense counsel on November 16, 2015, asking to be notified if and when Dr. Redwood or Dr. Johnson changed their opinions in response to the pyelogram images. Defense counsel did not respond to that letter.

Counsel for Women First countered that the objection to Dr. Redwood's testimony was waived because it was not raised when his *de bene esse* deposition was taken on December 9, 2015, and disputed that Dr. Johnson's testimony had "chang[ed][.]"

The court denied the motion *in limine* but permitted Ms. Harris's counsel to cross-examine Dr. Johnson on the issue, which he later did. Drs. Johnson and Redwood each

---

[18] Apparently, counsel for Ms. Harris learned of this new opinion for the first time during Dr. Redwood's *de bene esse* deposition.

-41-

testified that the pyelogram did not show an injury to the left ureter where the left uterine artery crossed it. Rather, it showed an intact left ureter all the way to "the entry point of the ureter into the bladder[,]" which is "2 or 3 centimeters" below the point where the uterine artery crosses it and "away from where Dr. McMillan was working" with the harmonic scalpel. Dr. Redwood opined that the leak of iodine contrast from Ms. Harris's left ureter into her abdomen, captured in images from the pyelogram, was an injury "created by [Dr. Karr] during [the pyelogram] procedure[,]" specifically, by Dr. Karr's inserting a needle and catheter in the left ureter.

Meanwhile, after Dr. Johnson testified but before the defense rested its case, Ms. Harris sought to call Dr. Karr as a fact and expert rebuttal witness to testify that Drs. Johnson and Redwood were misinterpreting the pyelogram. Counsel for Women First objected, arguing that Dr. Karr's testimony would not be true rebuttal, as Ms. Harris's counsel had had ample reason to anticipate that Drs. Johnson and Redwood would disagree with Dr. Aron's interpretation of the pyelogram, and it was Ms. Harris's counsel's fault that the pyelogram images were not provided farther in advance. Counsel for Women First also objected on the ground that Ms. Harris had not designated Dr. Karr as an expert witness.

The court granted Ms. Harris's request, relying in part on our decision in *Riffey v. Tonder,* 36 Md. App. 633 (1977), and in part on the November 16, 2015 letter between opposing counsel:

> So, in this regard, if I'm looking at this case of *Riffey*, which is eerily on point factually as to the facts that – not the facts that we're dealing with medically, but the type of case, [in *Riffey*] the plaintiff's theory, the

defendants have their own theory, and the plaintiff endeavored to call a rebuttal witness to counter what the defendants' witnesses had testified to at trial, the court didn't allow it, and it was determined that it was proper rebuttal evidence.

And, in this case, our case, I believe the same thing to be the case. [Ms. Harris] ha[s] put [Women First] on notice of this study, sent them the study, went into detail of telling them what Dr. Aron's opinion would be based on the CD with the antegrade pyelogram and nephrostomy study done by Dr. Karr, and also offered him for further deposition should the need arise, and expected that they would be provided with the same information, whether they had said that last part or not [in the November 16, 2015 letter,] [the study] had been provided.

The testimony by the Defense is counter to the moving party who has the burden of proof, and I believe looking at the case law, as well as the statute, which deals with rebuttal evidence, the plaintiff is entitled to put on rebuttal evidence to contradict that which the defendants' experts have now testified to.

Dr. Karr testified that he did not cause any injury to Ms. Harris's left ureter during the pyelogram procedure for two reasons. First, before he inserted the needle and catheter, he saw the leakage of contrast iodine outside the walls of the left ureter, at a point 3 to 5 centimeters above the point where that ureter entered the bladder. Second, the initial act of injecting the contrast iodine into the kidney could not have caused a leakage at the point observed in the pyelogram in an otherwise intact ureter; one would "typically see a leak" in the area "around the needle that . . . we've put into the kidney" when the leak is caused by "inject[ing] a lot of pressure[.]" He demonstrated that the pyelogram images did not depict an intact ureter past the point of the leak and obstruction and clarified that Drs. Redwood and Johnson had misinterpreted the pyelogram images by mistaking "shadow[s]" captured by the images and the catheter needle "extending" outside and beyond the ureter for the ureter itself. He stated that his written report of the

-43-

pyelogram procedure clearly identified the locus of the leakage and obstruction and could not be properly read to mean the left ureter was intact until "just before the bladder."

Women First argues that Dr. Karr's testimony was not proper rebuttal evidence because it "did not rebut any *new matter* raised by [Women First] in its case-in-chief[.]" (Emphasis in Appellant's Brief.) Specifically, Drs. Redwood and Johnson "interpreted the same pyelogram [study] and opined regarding the same issues of location and causation" of the injury to Ms. Harris's left ureter as Dr. Aron and therefore did not present any "new matter."[19] In addition, Ms. Harris did not designate Dr. Karr as an expert witness before trial.

Ms. Harris counters that the court properly permitted Dr. Karr to testify as a rebuttal witness, because in their testimony Drs. Redwood and Johnson expressed two entirely "new" opinions that were not disclosed before trial and therefore could not be addressed in her case-in-chief: (1) that her left ureter "was completely intact from the kidney all the way down to the bladder"; and (2) that the injury to her left ureter was caused by Dr. Karr. Ms. Harris does not address whether the court should have allowed Dr. Karr to testify as an undesignated expert witness.

---

[19] In arguing this point, Women First seems to be maintaining that the fact that Drs. Redwood and Johnson relied on nine images from the pyelogram in their trial testimony whereas Dr. Aron only relied upon three images did not make Drs. Redwood's and Johnson's testimony "new matter"; and that Dr. Karr's rebuttal testimony "effectively gutted" Women First's cross-examination of Dr. Aron, which exposed his "fail[ure] to show the complete pyelogram study to the jury." These arguments are irrelevant, as Ms. Harris has never taken the position that Drs. Redwood and Johnson testified to new matters based on the number of slides they viewed from the pyelogram.

It is within the discretion of the trial court to admit rebuttal testimony. *Riffey v. Tonder,* 36 Md. App. 633, 645–46 (1977) ("[W]hether evidence is properly rebuttal is a matter for the exercise of judicial discretion."). We "will not reverse for error in this determination unless the ruling of the trial court was both 'manifestly wrong' and 'substantially injurious.'" *Id.* at 646 (quoting *Hepple v. State,* 31 Md. App. 525, 532 (1976)).

We see no abuse of discretion in the court's decision to allow Dr. Karr to testify as a rebuttal witness. Rebuttal evidence is "any competent evidence which explains, is a direct reply to[,] or a contradiction of material evidence introduced by an accused in a criminal case or by a party in a civil action." *Id.* at 645 (additional citations omitted). "'Although rebuttal evidence is a matter of right, for evidence to be admissible as "true" rebuttal . . . it must respond to new matter.'" *Schwartz v. Johnson,* 206 Md. App. 458, 503–04 (2012) (quoting Joseph F. Murphy, Jr., *Maryland Evidence Handbook* 104 (Matthew Bender, 4th ed., 2010). The opinions of Drs. Redwood and Johnson expressed at trial included previously undisclosed and unanticipated "new matter" that Dr. Karr's testimony "direct[ly] repl[ied] to" and "contradict[ed.]"

Women First does not dispute that in their pretrial depositions Drs. Redwood and Johnson agreed with Dr. Aron about the location of the injury to Ms. Harris's left ureter; and Women First's only theory of defense before trial was that the defect to Ms. Harris's left ureter was a delayed-onset injury caused by a disruption of the blood supply to the ureter during the hysterectomy. Nor does Women First dispute that it did not inform Ms. Harris's counsel that Drs. Redwood's and Johnson's opinions had changed after their

-45-

pretrial depositions, even though defense counsel had received the November 16, 2015 letter from Ms. Harris's counsel requesting any such information. Thus, the opinions Drs. Redwood and Johnson expressed at trial about the pyelogram images showing that Ms. Harris's left ureter was intact (uninjured) past the point identified by Dr. Aron until its entrance into the bladder and the leakage of iodine contrast from the left ureter were a surprise to Ms. Harris. They supported undisclosed novel defense theories that Ms. Harris could not have anticipated before trial.

Dr. Karr's rebuttal testimony explained that Drs. Redwood and Johnson had misidentified other structures on the pyelogram images as Harris's left ureter, and that the left ureter was not intact to its entry point to the bladder. He also explained that he observed the leakage defect in Harris's left ureter before inserting a catheter and thus could not have caused the defect in that manner. These opinions exclusively and directly addressed the new matters first raised by Drs. Redwood and Johnson in their trial testimony; they did not echo Dr. Aron's opinion in Ms. Harris's case-in-chief. Accordingly, the court did not abuse its discretion by permitting Dr. Karr to testify as a rebuttal witness.

Moreover, it was within the court's discretion to permit Dr. Karr to testify as a rebuttal witness even though Ms. Harris did not designate him as an expert prior to trial. *Rodriguez v. Clarke,* 400 Md. 39, 56 (2007) ("Trial judges are vested with great discretion in applying sanctions for discovery failures.") (additional citations omitted). In this case, it fashioned an appropriate solution in response to what was essentially a

discovery dispute over Women First's failure to disclose the altered opinions of its expert

witnesses.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**
