IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WINDSOR I, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N18C-06-115 EMD CCLD |
| | ) | |
| CWCAPITAL ASSET MANAGEMENT LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR-IN-INTEREST TO BANK OF AMERICA, N.A., AS TRUSTEE, SUCCESSOR TO WELLS FARGO, N.A. AS TRUSTEE FOR THE REGISTERED HOLDERS OF COBALT CMBS COMMERCIAL MORTGAGE TRUST 2007-C2, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2007-C2, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: June 28, 2019
Decided: September 27, 2019

*Upon Defendants' Motion to Dismiss Amended Complaint*
***GRANTED***

Melvyn I. Monzack, Esquire, Michael C. Hochman, Esquire, Monzack Mersky McLaughlin and Browder, P.A., Wilmington, Delaware *Attorneys for Plaintiff.*

Jamie L. Edmondson, Esquire, Daniel A. O'Brien, Esquire, Venable LLP, Wilmington, Delaware, Gregory A. Cross, Esquire, Brent W. Procida, Esquire, Venable LLP, Baltimore, Maryland *Attorneys for Defendants.*

**DAVIS, J.**

# I. INTRODUCTION

This is an action for quasi-contractual relief assigned to the Complex Commercial Litigation Division of the Court. Plaintiff Windsor I, LLC ("Windsor") brings this action for promissory estoppel and unjust enrichment against Defendants CWCapital Asset Management LLC ("CWCAM") and U.S. Bank National Association as trustee for certain holders of certain certificates ("U.S. Bank" and collectively with CWCAM, the "Defendants"). The Defendants now move to dismiss the case (the "Motion"). For the reasons set forth below, the Court **GRANTS** the Motion.

# II. BACKGROUND

## A. FACTUAL BACKGROUND[1]

Windsor is a Delaware limited liability company[2] that owns a 48,000 sq. ft. plot of land and building located at 2201 Farrand Drive, Wilmington, Delaware (the "Property").[3] CWCAM is a Delaware limited liability company and is the special servicer for U.S. Bank.[4] CWCAM helps restructure distressed loans on behalf of investors who have purchased the loans.[5] U.S. Bank is a national banking association with its headquarters in Cincinnati, Ohio.[6]

On December 27, 2006, Windsor and CWCapital, LLC entered into a mortgage and security agreement for a principal amount of $7.4M (the "Loan") to refinance the debt on the Property.[7] Windsor also signed a promissory note (the "Note") for the benefit of CWCapital,

---

[1] Unless otherwise indicated, the following are the facts as alleged in the Amended Complaint. For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to WSFS. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).
[2] Am. Compl. ¶ 1.
[3] *Id.* ¶ 13.
[4] *Id.* ¶¶ 2-3.
[5] *Id.* ¶ 6.
[6] *Id.* ¶ 4.
[7] *Id.* ¶ 15.

LLC.[8] The Note was subsequently assigned from CWCapital, LLC to other banks and finally to U.S. Bank.[9]

Best Buy, the electronics store, was the sole tenant on the Property for around twenty years. In June 2015, Windsor learned that Best Buy would vacate the Property. Windsor sought to refinance its Loan as a result of its sole tenant vacating the Property. Windsor started working with CWCAM to refinance the Loan. On November 21, 2015, Windsor received a draft "pre-negotiation agreement" ("PNA") from David Smith, a Senior Vice President at CWCAM, discussing the terms under which the parties would negotiate.

On December 12, 2016, Windsor filed a Complaint for specific performance, injunctive, and other equitable relief in Chancery Court (the "Chancery Action"). [10] In the Chancery Action, Windsor sought equitable relief to require CWCAM to negotiate with Windsor in good faith. On February 2, 2017, CWCAM filed a motion to dismiss the Chancery Action. The Chancery Court granted that motion to dismiss on July 31, 2017. In dismissing the action, the Chancery Court noted that the PNA did not impose an enforceable obligation to negotiate, stating "when read as a whole, the Pre-Negotiation Agreement is a document that simply establishes rules to govern any discussions that may take place. It does not obligate any party to negotiate or forbear from exercising remedies otherwise available."[11]

On April 26, 2017, CWCAM offered to sell the Loan to Windsor for $5,288,000 ("$5.3M") by email (the "Offer"). The Offer included the following conditions: "subject to credit committee approval, adequate proof of [Windsor]'s ability to fund, execution of appropriate documentation and closing by May 30." Windsor responded via email accepting the Offer (the

---

[8] *Id.*
[9] *Id.* ¶ 17.
[10] *Windsor I, LLC v. CWCapital Asset Mgmt., LLC*, 12977-CB.
[11] *Windsor I, LLC v. CWCapital Asset Mgmt., LLC,* 2017 WL 3499919, at *3 (Del. Ch. July 31, 2017).

"Acceptance"). After accepting the Offer, Windsor drafted a loan acquisition agreement and coordinated with a lender to borrow the money to buy the Loan. Three weeks later, CWCAM notified Windsor that the credit committee had rejected the Acceptance. Windsor claims that the Offer and Acceptance created a valid contract (the "Proposed Transaction").

On August 28, 2017, CWCAM, on behalf of U.S. Bank, filed an action for foreclosure against Windsor in the Superior Court (the "Foreclosure Action").[12] CWCAM filed a second action in the Federal District Court for the District of Delaware naming Windsor's guarantors, Robert Stella, Constantine Michell, and Theodore Michell as defendants.[13] On February 15, 2018, the Superior Court stayed the Foreclosure Action and ordered the parties to participate in an alternative dispute resolution process by March 15, 2018.

Between February 13 and February 15, 2018, CWFS-REDS, LLC, an affiliate of CWCAM, held an online auction to sell the Loan. Robert Stella bid in the online auction on behalf of FCS Lending, LLC ("FCS"). Mr. Stella is an equity owner of Windsor. As a condition of bidding, Mr. Stella executed the "RealINSIGHT Marketplace Auction Sale Terms and Conditions/Bidder Confidentiality" (the "terms and conditions"). The terms and conditions contain the following release (the "General Release"):

> EACH BIDDER RELEASES CW REDS, RI AND THEIR EMPLOYEES,
> AGENTS, AFFILIATES, DIRECTORS, AND SUBSIDIARIES
> ("REPRESENTATIVES") FROM ANY CLAIMS, WHETHER CURRENT OR
> FUTURE, AGAINST CW REDS, RI OR THEIR REPRESENTATIVES. THIS
> WAIVER IS INCLUSIVE OF ANY AND ALL CLAIMS OF WHICH BIDDER
> IS CURRENTLY UNAWARE, REGARDLESS OF WHETHER SUCH
> CLAIMS WOULD AFFECT BIDDER'S RELEASE OF CW REDS AND/OR
> RI.[14]

---

[12] N17L-08-156 ALR.
[13] 1:17-CV-01732 (MWB). This action was filed in federal court under the justification of diversity of parties' citizenship.
[14] Motion, Ex. 12, at 6.

In order to accept the terms and conditions, the bidder must scroll through the terms and conditions.

On March 7, 2018, CWCAM sold the Loan to a third-party, WM Capital Partners 66, LLC ("WM Capital"). In the Complaint, Windsor cites the *Trepp Report* issued on April 1, 2018, which estimated that CWCAM sold the Loan for $4.6M.[15] After the sale of the Loan, Windsor paid $7.4M to WM Capital in order to pay off the principal of the Loan and to avoid paying default interest and other penalties.

## B. PROCEDURAL BACKGROUND

On June 15, 2018, Windsor filed the complaint (the "Complaint") against the Defendants for breach of contract. Windsor contended that the Defendants breached an alleged agreement when the creditors' committee refused to consummate the Proposed Transaction.

The Court held a hearing on December 3, 2018. At this hearing, the Court held that Windsor could not sustain its claims for breach of contract but may plead quasi-contractual claims. On December 12, 2018, the Court entered an order dismissing the Complaint without prejudice.

On December 21, 2018, Windsor filed an amended complaint (the "Amended Complaint"). The Amended Complaint has two counts. In Count I, Windsor alleges a claim for promissory estoppel. Windsor claims that CWCAM, as an agent for US Bank, promised to sell the Loan to Windsor. Windsor also contends that Windsor reasonably relied on CWCAM's promise to sell and suffered damages as a result of its reliance. In Count II, Windsor brings a claim for unjust enrichment. Windsor asserts that CWCAM gained an enrichment because it accrued ten months of servicing fees after CWCAM should have sold the Loan to Windsor and

---

[15] CWCAM provides that it sold the Loan for $5.75M and includes an affidavit from James Shelvin, the CEO of WM Capital affirming this number.

CWCAM's affiliate got a 5% auction fee. In addition, Windsor alleges that Windsor suffered an impoverishment because Windsor expended time, money and resources in order to timely comply with the closing requirements for the Proposed Transaction.

On February 1, 2019, the Defendants filed Defendants' Opening Brief in Support of Motion to Dismiss Amended Complaint (the "Motion"). On March 18, 2019, Windsor filed Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss (the "Opposition"). The Defendants filed Defendants' Reply Brief in Support of Motion to Dismiss Amended Complaint (the "Reply") on April 15, 2019. The Court held a hearing on the Motion on June 28, 2019. At the conclusion of the hearing, the Court took the matter under advisement. This is the Court's decision on the Motion.

### III. STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[16] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[17]

### IV. DISCUSSION

#### A. WINDSOR'S CLAIMS ARE BARRED BY THE GENERAL RELEASE IN THE AUCTION

In the Motion, the Defendants argue that all of Windsor's claims are barred by the General Release contained in the terms and conditions for the online auction.

---

[16] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[17] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

### 1. *The General Release Applies to this Case*

Delaware courts recognize the validity of general releases.[18] "It is settled law, in Delaware, that a release must be read as a whole with the intent derived from the entire agreement."[19] Where the language of the release is clear and unambiguous, it will only be set aside "where there is fraud, duress, coercion, or mutual mistake concerning the existence of the party's injuries."[20] The party seeking to nullify the release bears the burden of demonstrating by clear and convincing evidence that the release is invalid.[21]

Windsor makes a number of arguments against application of the General Release. First, Windsor contends that the terms and conditions do not bar Windsor's claims because Windsor's claims arise from the Proposed Transaction rather than the online auction. Second, Windsor asserts that the General Release does not protect U.S. Bank because the term "Representative" does not include U.S. Bank. Third, Windsor states that CWCAM forwarded a Purchase Release to Windsor after the Proposed Transaction that contained a general release.[22] Windsor contends that if CWCAM believed the General Release applied then CWCAM would not have prepared the Purchase Release. Fourth, Windsor argues that the release is not clear and unambiguous because the phrase "inclusive of any and all claims of which bidder is currently unaware, regardless of whether such claims would affect bidder's release of CW REDA and/or RI" is unintelligible.

The Court finds that the General Release bars Windsor's claims even though Windsor's claims arise from the Proposed Transaction. As drafted, the General Release is broad and

---

[18] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 2012 WL 1409013, at *6 (Del. Super. Apr. 4, 2012), *aff'd*, 55 A.3d 330 (Del. 2012).

[19] *See Junge v. Smyrna Rental & Repair, Inc.,*1998 WL 960716, at *2 (Del. Super. June 2, 1998).

[20] *Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB,* 2001 WL 946521, at *4 (Del. Super. Apr. 16, 2001).

[21] *Id.*

[22] Windsor does not allege these facts in the Amended Complaint. Windsor presents the facts in its Opposition.

addresses current and future claims of the Bidder.  This makes sense under the circumstances.

Why would an auctioneer, seller or other entity engage in an auction with someone that would

assert legal claims against them—whether current or future claims?

In *Geier v. Mozido, LLC*,[23] the Court of Chancery found that claims which arose before

the execution of a general release were barred by the general release.  In that case, the Court of

Chancery reasoned that the plaintiff was aware of its claims at the time the parties signed the

release, but the parties did not carve-out an exception to the general release for the plaintiff's

claims.  Here, as in *Geier*, Windsor was aware of its claims from the Proposed Transaction

before the online auction.  Windsor, however, did not carve-out an exception to the General

Release for claims arising from the Proposed Transaction.  As executed, the General Release

bars Windsor's claims arising from the Proposed Transaction.  The facts here are more

compelling than in *Geier* given the related nature of the transactions—the Proposed Transaction

and the online auction were both sales for the same underlying loan.

Moreover, Windsor and the Defendants fall within the definitions of who will be

governed by the General Release.  In the terms and conditions, "Bidder" is broadly defined as the

bidding entity together with its "agents, principals and affiliates."[24]  As per the terms and

conditions, the Bidder releases "CW REDS, RI AND THEIR EMPLOYEES, AGENTS,

AFFILIATES, DIRECTORS AND SUBSIDIARIES…."[25]  In order to determine the meaning of

the word "affiliate," the Court may look to the Merriam Webster dictionary of "affiliate." The

definition includes "an affiliated person or organization," "being close in connection, allied,

---

[23] 2016 WL 5462437, at *7 (Del. Ch. Sept. 29, 2016).
[24] Motion, Ex. 12, at 6.
[25] Id.

8

associated, or attached as a member or branch," or "[s]omeone who controls, is controlled by, or under common control with an issuer of a security."[26]

Factually, Mr. Stella is an owner of Windsor and FCS. Mr. Stella accepted the terms and conditions on behalf of FCS, the bidding entity in the online auction. Windsor is considered a Bidder because Windsor and FCS are affiliated entities as a result of their common ownership. Neither party disputes that CWCAM is an affiliate of CWCS-REDS.

The Court holds that the General Release applies to and bars claims against U.S. Bank. CWCAM is the servicer of U.S. Bank. CWCAM is the agent of U.S. Bank. Windsor acknowledges this and alleges in the Amended Complaint that "[a]t all times relevant to this Complaint, CWCAM acted as the authorized agent of U.S. Bank, and its predecessor trusts."[27] In the Amended Complaint, Windsor only mentions U.S. Bank by stating that CWCAM is acting on behalf of U.S. Bank and alleges no separate action or conduct by U.S. Bank.

The Defendants rely upon *Anne Arundel Medical Center, Inc. v. Condon*[28] to contend that the General Release applies to U.S. Bank even though the term "principal" is not included in the defined term "representative." In *Condon*, the Maryland Court of Special Appeals released a principal from liability because the lower court had released the agent from liability. In releasing the principal, the *Condon* Court held that "[a]bsent independent wrongdoing by the principal, the release of an agent will also release the principal as a matter of law[,]" for, in that scenario, the release of the agent "removes the only basis for imputing liability to the

---

[26] *See Geier v. Mozido, LLC*, 2016 WL 5462437, at *6 (Del. Ch. Sept. 29, 2016) (analyzing the dictionary definition of "affiliate" in order to determine its meaning in the context of a general release).

[27] Am. Compl. ¶ 12.

[28] 649 A.2d 1189, 102 Md. App. 408, 421 (Md. Spec. App. 1994) ("The release of an agent removes the only basis for imputing liability to the principal").

principal."[29]  A later Maryland Court of Special Appeals decision, *Women First OB/GYN*

*Associates, L.L.C. v. Harris*,[30] explained the rationale behind *Condon* as:

> Because common law agency principles dictate that the release of a claim against
> the employee discharges the employer's vicarious liability for the employee's
> wrongdoing, the plaintiff's release of her claim against the pathologist discharged
> her claim against the hospital, as a matter of law, irrespective of her intent.  *See
> also Rivera*, 102 Md. App. at 466, 649 A.2d 1212 ("[T]he release of an agent
> automatically release[s] the principal" under the common law, which remains
> unchanged in Maryland.).[31]

In this case, the Court finds the reasoning set out in *Condon* to be persuasive.  The Court

has explored Delaware law and, while no case specifically addresses this situation, Delaware and

Maryland similarly apply the common law of agency.[32]   Moreover, Windsor has not alleged any

independent basis to hold U.S. Bank liable other than U.S. Bank's involvement as CWCAM's

principal.  The release of CWCAM under the General Release therefore automatically released

U.S. Bank because it removed the only basis for imputing liability to U.S. Bank.

The existence of the Purchase Release does not affect the Court's decision that the

General Release acts as a bar to Windsor's claims against CWCAM and U.S. Bank.  The fact

that CWCAM prepared the Purchase Release with a general release does not mean that the terms

and conditions do not contain a valid general release.  Because Mr. Stella acted through FCS,

CWCAM likely did not know that this participation would bar Windsor's claims until sued.

Importantly, the Court finds that the General Release is clear and unambiguous.  The

terms of the General Release clearly state that the parties agree to disclaim liability for claims of

which they are unaware.  As presented, the General Release states, in all caps, that:

---

[29] *Id.*

[30] 161 A.3d 28, 232 Md. App. 647 (Md. Spec. App. 2017).

[31] Id. at 661.

[32] *See, e.g., Clark v. Brooks*, 377 A.2d 365, 373-74 (Del. Super. 1977)(discussing common law principles of agency
and the Restatement of Agency).

EACH BIDDER RELEASES CW REDS, RI AND THEIR EMPLOYEES, AGENTS, AFFILIATES, DIRECTORS, AND SUBSIDIARIES ("REPRESENTATIVES") FROM *ANY CLAIMS, WHETHER CURRENT OR FUTURE*, AGAINST CW REDS, RI OR THEIR REPRESENTATIVES. THIS WAIVER IS INCLUSIVE OF *ANY AND ALL CLAIMS OF WHICH BIDDER IS CURRENTLY UNAWARE*, REGARDLESS OF WHETHER SUCH CLAIMS WOULD AFFECT BIDDER'S RELEASE OF CW REDS AND/OR RI. (emphasis added).[33]

The General Release is straightforward and clear—"any claims whether current or future" and "any and all claims of which bidder is currently unaware."[34] Windsor has not provided the Court with any other interpretation of the General Release that is plausible. Moreover, Delaware court have found general releases which disclaim liability for claims of which the parties are unaware to be enforceable.[35]

### 2. The Terms of Service Create a Valid Contract

Next, Windsor asserts that the Defendants have not stated that bidders on the online auction were required to accept the terms and conditions before placing an electronic bid. The Amended Complaint does not mention the terms and conditions. In response, the Defendants present evidence that all bidders, including Mr. Stella, accepted the terms and conditions before entering a bid. In fact, all bidders were required to scroll through the terms and conditions in a pop-up screen before they could accept them. In addition, the Defendants argue that Delaware courts have found electronic agreements, such as the terms and conditions, enforceable in the same manner as conventional contracts.

---

[33] Motion, Ex. 12, at 6.

[34] *Id.*

[35] *See Seven Investments, LLC v. AD Capital, LLC,* 32 A.3d 391, 395 (Del. Ch. 2011) (finding that a general release enforceable in which the parties acknowledged that "they each intended 'to give a full and complete release and discharge of the Released Claims,' notwithstanding that 'they may be unaware of or may discover facts in addition to or different from those which they now know or believe to be true related to or concerning the Released Claims or the Released Persons.'" The parties further acknowledged "that such presently unknown or unappreciated facts could materially affect the claims or defenses of a party or parties and the desirability of entering into this Agreement.").

The Court finds that the terms and conditions create a valid contract. In *Newell Rubbermaid Inc. v. Storm*,[36] the Delaware Court of Chancery found that electronic agreements are enforceable as long as "the party who assented online ha[d] reasonable notice, either actual or constructive, of the terms of the putative agreement and [ ] that party manifest[ed] assent to those terms." In that case, the Court of Chancery also held that,

> It is not determinative that the 2013 Agreements were part of a lengthy scrolling pop-up. [The employee's] failure to review fully the terms (on a 10–page readily accessible agreement) to which she assented also does not invalidate her assent. A party may assent to an agreement on the internet without reading its terms and still be bound by it if she is on notice that she is modifying her legal rights, just as she may with a physical written contract.[37]

Here, Mr. Stella, an owner of Windsor, had notice of the terms and conditions. Mr. Stella had the opportunity to read the terms. In addition, Mr. Stella then accepted these terms and conditions. The facts that Windsor may not have read the terms and conditions, understood that the terms and conditions apply to the Proposed Transaction or known that CWCAM and U.S. Bank are affiliated with CWFS-REDS do not make the terms and conditions unenforceable. This is because Mr. Stella was under no obligation or constraint to sign the terms and conditions or participate in the bidding.

### 3. The Parties Intended to be Bound by the Terms and Conditions

Finally, Windsor claims that it did not knowingly waive its claims against CWCAM and U.S. Bank. In *Riverbend Community., LLC v. Green Stone Engineering, LLC*,[38] this Court found that the plaintiffs' argument that a release of all liabilities was not valid because the plaintiffs believed they had signed a partial release was unavailing. The Court reasoned that the release clearly and unambiguously released the defendants from *all* liabilities.

---

[36] 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (internal brackets and quotes omitted).
[37] *Id.* at *7.
[38] 2012 WL 1409013, at *7 (Del. Super. Apr. 4, 2012), *aff'd,* 55 A.3d 330 (Del. 2012).

Here, as in *Riverbend Community*, the release clearly and unambiguous releases the Defendants from all liabilities. Windsor's argument that it did not intend to release the Defendants is not persuasive. This is because Mr. Stella accepted the terms and conditions, which shows that he intended to agree to the terms therein.

The Court finds that Windsor's claims are barred by the release because the release applies to the Proposed Transaction, is clear and unambiguous and is enforceable.

## B.   THE CLAIMS ARE NOT BARRED BY RULE 13(A)

Rule 13(a), as to compulsory counterclaims, provides that a counterclaim must be brought "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."[39]  If a compulsory counterclaim is not raised in an earlier action arising out of the same transaction or occurrence, it will be barred in subsequent litigation.[40]  The Court holds that Windsor is not barred by Superior Court Civil Rule 13(a) ("Rule 13(a)") from seeking recovery for promissory estoppel and unjust enrichment because it was not required to have pled those claims in earlier foreclosure proceedings.

In the Motion, the Defendants argue that Windsor is barred from seeking recovery for promissory estoppel and unjust enrichment because they failed to plead those actions as counterclaims in the Foreclosure Action.  The Defendants go on to argue that because unjust enrichment and promissory estoppel were permitted as affirmative defenses in the Foreclosure Action, Windsor also should have pled these claims as counterclaims.

---

[39]Super. Ct. Civ. R. 13(a) ("Compulsory counterclaims.  A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the Court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the Court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule.").
[40]*See Mott v. State*, 49 A.3d 1186, 1189 (Del. 2012); *see also T.A.H. First, Inc. v. Clifton Leasing Co., Inc.*, 90 A.3d 1093, 1094 (Del. 2014).

13

In the Opposition, Windsor claims that the Defendants' Rule 13(a) argument fails as a matter of law because promissory estoppel and unjust enrichment could not have been brought as counterclaims in the earlier foreclosure litigation. Windsor notes that foreclosure actions are *in rem* proceedings, while the current dispute about the sale of the loan involves *in personam* claims. Therefore, any claims related to the sale of the loan are not compulsory counterclaims in the foreclosure proceedings.[41]

In prior legal action, the Defendants filed a *scire facias sur* mortgage foreclosure complaint alleging Windsor defaulted on a mortgage loan owed to them and sought to foreclose on the mortgage. In that action, the Court allowed Windsor to raise the affirmative defenses of promissory estoppel and unjust enrichment.[42] The Court noted that Windsor's "Affirmative Defenses constitute permissible pleas in avoidance under *Shrewsbury*[43]. . . [because they] relate to an alleged preliminary agreement to resolve the underlying mortgage, which is the subject matter of the complaint."[44]

In addition to the right of a mortgagee to foreclose on a mortgage in equity, Delaware law allows a mortgagee the additional remedy of enforcing the mortgage by writ of *scire facias* in the Superior Court.[45] A writ of *scire facias* is an *in rem* proceeding.[46] "In essence, a writ of *scire facias* [] is a rule to show cause that requires the mortgagor to appear and establish why the mortgagee should not be allowed to foreclose."[47] Therefore, a mortgagor is permitted to plead

---

[41] *See CitiMortgage, Inc. v. Bishop,* 2011 LEXIS 6819, at *2-3 (Del. Super. Mar. 7, 2011).
[42] Motion, Ex. 8.
[43] Motion, Ex. 8, at 4 (citing *Shrewsbury v. The Bank of New York Mellon*, 160 A.3d 471, 475 (Del. 2017) (providing examples of legitimate plea in avoidance defenses).
[44] Motion, Ex. 8, at 4.
[45] *See* 10 *Del. C.* § 5061(a).
[46] *Wells Fargo Bank, N.A. v. Williford*, 2011 WL 5822630, at *3 (Del. Super. Nov. 17, 2011).
[47] *American Nat'l Ins. Co. v. G-Wilmington, Assocs., LLP.*, 2002 WL 31383924, at *2 (Del. Super. Oct. 18, 2002) (tracing the history of the Pennsylvania *scire facias* act to explain the remedy of *scire facias sur* mortgage in Delaware); *see also Davenport Servs., Inc. v. Five North Corp.,* 2003 WL 21739066, at *2 (Del. Super. May 19, 2003) (observing that a *scire facias* mortgage action derives from a writ of *scire facias* which requires "the

only those claims or counterclaims arising under the mortgage itself.[48] This is limited to three

defenses: payment, satisfaction, or avoidance of the mortgage.[49] A plea in avoidance, however,

"must relate to the mortgage sued upon, *i.e.*, the plea must relate to the validity or illegality of the

mortgage documents."[50] Traditionally recognized avoidance defenses include: "acts of God,

assignment, conditional liability, duress, exception, forfeiture, fraud, illegality, justification, non-

performance of condition precedents, ratification, unjust enrichment, and waiver."[51] If a

mortgagor fails to assert one of these legally recognized defenses, the mortgagee is entitled to

summary judgment.[52]

     In *Gordy v. Reform Building Components, Inc.*, the plaintiff filed an action of *scire facias*

*sur* mortgage to foreclose a mortgage executed by the defendant mortgagor.[53] The plaintiff filed

a motion for summary judgement and the defendant moved for permission to file a counterclaim

seeking judgement against the individual mortgagees on a different matter that was being

litigated in Pennsylvania.[54] The Court found that the issue was "whether the defendant [was]

entitled to assert this set off in this mortgage foreclosure action."[55] The Court noted that the

counterclaim in *Gordy* was permissive because it did "not arise out of the mortgage transaction

---

mortgagor to show cause why judgment should not be given against him for the amount of the mortgage debt with a special execution for the sale of the mortgaged premises").

[48]*American Nat'l Ins. Co.*, 2002 WL 31383924, at *2.

[49]*Id.*

[50]*Id.*

[51]*Id.*

[52]*See JPMorgan Chase Bank v. Hopkins*, 2013 WL 5200520, at *2-3 (Del. Super. Sept. 12, 2013) (granting summary judgment because no genuine issue of material fact existed where defendant did not plead payment, satisfaction, or avoidance of the mortgage); *Wells Fargo Bank, NA v. Nickel*, 2011 WL 6000787, *2 (Del. Super. Nov. 18, 2011) (granting summary judgment because the "Defendant did not plead payment, satisfaction or avoidance of the mortgage in her Answer . . . Defendant has failed to set forth specific facts that a genuine issue of material fact exists and she has raised no defenses that may be properly asserted in an action for *scire facias sur* mortgage"); *CitiMortgage, Inc. v. Kine*, 2011 WL 6000755, at *1-2 (Del. Super. Nov. 1, 2011) (granting plaintiff mortgage company's motion for summary judgment where defendant asserted legal defenses and claimed she never received a copy of the Fair Debt Collections Practices Act).

[53]310 A.2d 893, 894 (Del. Super. 1973).

[54]*Id.*

[55]*Id.*

asserted in the complaint."[56] The Court held "in the light of the long line of precedents and the nature of the proceedings, the permissive counterclaim sought to be asserted in this [*scire* facias] action in this Court is not properly allowable."[57] Subsequent cases have followed the reasoning in *Gordy* and not permitted permissive counterclaims which did not arise out of the mortgage transaction.[58]

In *Citimortgage*, the defendants purchased a property which was the subject of a foreclosure action.[59] The mortgage was secured "through Mortgage Electronic Registration Systems, Inc. acting solely as nominee for lender, Cardinal Financial Company. Subsequently, the mortgage was assigned to Citimortgage, Inc."[60] Citimortgage filed a mortgage foreclosure action against the defendants.[61] The Court held that these counterclaims were not compulsory and noted "the counterclaims raised by the Defendants do not relate the subject matter of Plaintiff's complaint because this is an *in rem* proceeding and the counterclaims are *in personam*."[62] The Court elaborated on this distinction noting that "[e]ven though the counterclaims relate to the mortgage on the property, they are *in personam* because Defendants allege violations of fiduciary duties owed to them, the Real Estate Settlement Procedures Act ("RESPA"), and the Truth In Lending Act ("TILA")."[63] The Court granted the plaintiff's motion to dismiss the counterclaims because they were not compulsory.[64]

---

[56]*Id.*

[57]*Id.* at 896.

[58]*See Manley v. MAS Assocs., LLC,* 968 A.2d 492, 2009 WL 378172, at *2 (Del. 2009)(TABLE) (reaffirming that "permissive counterclaims may not be brought as part of a *scire facias* action, but they may be brought as part of a combined *in rem* and *in personam* action").

[59]*CitiMortgage, Inc. v. Bishop,* 2011 LEXIS 6819, at *1 (Del. Super. Mar. 7, 2011).

[60]*Id.* at *2.

[61]*Id.*

[62]*Id.* at * 2-3 (internal citations omitted).

[63]*Id.* at *3.

[64]*Id.*

Here, promissory estoppel and unjust enrichment are not one of the three acceptable defenses for a *scrie facias sur* mortgage foreclosure action, and therefore Windsor was not required to bring those claims. The Delaware Supreme Court has held "[i]n general, only those claims or counterclaims arising under the *mortgage* may be raised in a *scire facias sur* mortgage foreclosure action."[65]

Though the Court allowed the claims as affirmative defenses in the Foreclosure Action, this does not mean that the claims were compulsory counterclaims in the foreclosure action. The Court applied the reasoning from *Gordy*[66] and allowed the affirmative defenses to be raised in order to resolve the underlying mortgage. However, the Court stated it was "permissible" for Windsor to raise the claims as affirmative defenses, rather than "compulsory." As such, Windsor's claims were not compulsory, and therefore they are not barred by Rule 13(a).

The sale of the loan does not arise out of the same transaction or occurrence as the mortgage foreclosure.[67] The Court must examine different evidence for a mortgage foreclosure versus the sale of a loan. In a *scire facias sur* mortgage foreclosure action, the Court will consider the terms of the mortgage contract and the three defenses. This may include among other things, evidence of fraud or duress in drafting the mortgage, and natural disasters destroying the property. For the sale of a loan, the Court will consider the terms of the sale

---

[65]*Harmon v. Wilmington Tr. Co.*, 663 A.2d 487, 1995 WL 379214, at*2 (Del. June 19, 1995)(TABLE).
[66]310 A.2d 893, 896 (Del. Super. 1973).
[67]*See Mott v. State*, 49 A.3d 1186, 1189 n.8 (Del. 2012) (noting "[t]he tests applied to a counterclaim arising from the same transaction or occurrence, including same issues of fact and law, use of same evidence, and 'logical relation' between the claims, is whether there is a 'logical relationship' between the original action and the later action"); *see also Brady v. C.F. Schwartz Motor Co., Inc.*, 723 F.Supp. 1045, 1048 (D. Del. 1989) (applying the "logical relationship" test to determine whether a claim is compulsory); *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3rd Cir. 1978) (noting "a detailed analysis must be made to determine whether the claims involve: (1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties"); *Great Lakes Rubber Corp. v. Herbert Cooper Co., Inc.*, 286 F.2d 631, 634 (3rd Cir. 1961) (noting "a counterclaim is logically related . . . where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts").

17

agreement, and if there is an ambiguity, may consider testimony from the parties where they discuss their intentions drafting the sale agreement. Although the parties and some of the underlying facts are the same, the legal analysis relates to the different contracts and policies. The Court, therefore, finds that Windsor is not barred by Rule 13(a) from seeking recovery for promissory estoppel and unjust enrichment because (i) the counterclaims were not compulsory and (ii) the claims do not arise out of the same transaction or occurrence.

## C.    THE CLAIMS ARE NOT BARRED BY JUDICIAL ESTOPPEL AND THE PNA

Judicial estoppel is intended to preclude a party from arguing a position that is inconsistent with a position taken in the same or earlier related legal proceeding. The purpose of the doctrine is to protect the integrity of the judicial proceedings. "The two requirements of judicial estoppel are that a litigant advance an argument that contradicts a position previously taken by that same litigant, and that the Court was persuaded to accept as the basis for its ruling."[68]

The Defendants argue that Windsor may not sustain a claim for promissory estoppel or unjust enrichment because the PNA is a valid contract that controls the parties' April and May 2017 negotiations. The Defendants contend that Windsor is barred by the doctrine of judicial estoppel from arguing that the PNA does not govern the negotiations. This is because Windsor stated in the Chancery Action that the PNA is a valid contract which governed the negotiations and the Chancery Court adopted Windsor's argument in its opinion.

The Defendants also claim that the PNA was not terminated before the April and May 2017 negotiations and so applies to the negotiations. This is because the PNA requires written notice to terminate negotiations and can only be amended by a writing executed by all parties. In

---

[68] *La Grange Cmtys., LLC v. Cornell Glasgow, LLC*, 74 A.3d 653, 2013 WL 4816813, at *4 (Del. Sept. 9, 2013)(TABLE).

this case, the Defendants note that neither party terminated or amended the PNA in writing. Even if the PNA had been terminated, the Defendants emphasize that the terms of the PNA would survive the termination.

The Defendants contend that the PNA specifically states that the parties may not rely on the negotiations. As such, the Defendants argue that Windsor may not claim that it relied on the negotiations to meet the elements of promissory estoppel and unjust enrichment. The Defendants assert that the following provision suggests that the PNA is in effect and governs the sale of the Loan:

> [N]o agreement reached with respect to ***any matter*** (including, without limitation, any waiver of any right or remedy) ***shall have any effect whatsoever*** unless such agreement is reduced to writing, signed and delivered by all parties' authorized representatives.[69]

Finally, the Defendants characterize Windsor's argument that the PNA does not apply as an argument for an implied waiver[70] of the PNA. The Defendants contend that the theory of implied waivers does not apply here.

In response, Windsor argues that the parties terminated the PNA when Windsor filed the Chancery Action. Windsor cites CWCAM's statements at the Chancery Court hearing as support for its contention that both parties deemed the PNA terminated by the Chancery Action:

> "We [CWCAM] did on a certain level deem the filing of litigation against CWCapital to be effectively and practically a Notice of Termination by the borrower, but there isn't any reason why -- there is nothing irrevocable preventing the borrower and CWCapital to have additional discussions should they all choose to."[71]

---

[69] Am. Compl., Ex. F, at ¶ 2 (emphasis added).
[70] "The standard for finding waiver in Delaware is quite exacting. Waiver is the voluntary and intentional relinquishment of a known right.... It implies knowledge of all material facts and intent to waive. Moreover, the facts relied upon must be unequivocal in nature." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1289 (Del. 1994) (internal quotations omitted).
[71] Am. Compl., Ex. G, at 13:6-11.

19

Windsor also claims that the PNA does not address the sale of the Loan so the PNA is inapplicable. Finally, Windsor contends that it would be untenable for the PNA to apply because CWCAM could not obtain approval from the creditors' committee, proof of Windsor's abilities to fund its purchase of the Loan and execute the appropriate documents within the thirty-day window for closing contemplated in the PNA.

The Court holds that the Defendants cannot sustain a claim for judicial estoppel. The Defendants meet the first element of judicial estoppel. This is because Windsor now takes a contradictory position compared to Windsor's position in the Chancery Action. Here, Windsor argues that the PNA does not govern the April and May 2017 negotiations; however, in the Chancery Action, Windsor argued that the PNA governed these negotiations. But, the Defendants fail to satisfy the second element of a claim for judicial estoppel—that the court adopt the party's position in the earlier case as the basis of its opinion. The Chancery Court did not adopt Windsor's argument that the PNA was a valid agreement which applied to the April and May 2017 negotiations. Instead, the Chancery Court stated "when read as a whole, the Pre-Negotiation Agreement is a document that simply establishes rules to govern any discussions that may take place. It does not obligate any party to negotiate or forbear from exercising remedies otherwise available."[72] So, the Defendants have not stated a claim for judicial estoppel.

The PNA is a valid contract between the parties, but the PNA does not bar Windsor's claims. This is because the PNA is a contract which exclusively governs the negotiations between the parties rather than the sale of the Loan. The PNA specifically states that "[t]his letter constitutes an agreement between Holder and Borrower with respect to negotiations concerning

---

[72] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 2017 WL 3499919, at \*3 (Del. Ch. July 31, 2017)(internal citation omitted).

the Loan and the Loan Documents . . . ."[73]  In addition, the fact that Section 3 of the PNA states the Loan Documents between the parties are still in force suggests that the PNA does not govern substantive Loan provisions. So, the Court rejects the Defendants' argument that Windsor's claims are barred because there is a valid contract between the parties.

### D. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[74]  To survive a motion to dismiss a claim for unjust enrichment, a plaintiff must prove: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[75]

This Court has held that "a claim for unjust enrichment cannot stand if the parties' relationship and the claims asserted are the subject of an express contract because the terms of that contract control and there is no occasion to pursue the theory of *quantum meruit* or contract implied in law.'"[76]

The Court finds that Windsor's claim for unjust enrichment fails.  Windsor does not plead a scenario under which the Defendants were unjustly enriched.  This is clear because the Defendants sold a Loan for $7.4 million to the highest bidder for a little less than $6 million.  Any enrichment that the Defendants received was a result of a sale of a commercial note (and at a discount from face value) that the Defendants' validly held in the first instance.  The only

---

[73] Am. Compl., Ex. F at 1.
[74] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topp Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).
[75] *Id*.
[76] *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *5 (Del. Super. Sept. 25, 2015)(internal quotations omitted).

damages that Windsor suffered were the costs to obtain a loan in order to consummate the Proposed Transaction. But, the Defendant's conduct in selling the Loan to another buyer did not cause Windsor's damages. This is because the Defendants' sale of the Loan to another buyer did not cause Windsor to spend money to obtain a loan or otherwise enrich the Defendants. Instead, Windsor spent money of its own volition in order to prepare to purchase the Loan and had to pay cost/fees already associated with the original terms and conditions of the Loan.

### E. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL

Under the doctrine of promissory estoppel, a plaintiff must prove by clear and convincing evidence that: "(1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise."[77] In addition, to state a claim for promissory estoppel, a promise "must be definite and certain."[78] In *SIGA Technologies, Inc. v. PharmAthene, Inc.*, the Delaware Supreme Court held that "[p]romissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue."[79]

Windsor argues that promissory estoppel is a substitute for consideration and may be used to avoid the statute of frauds. Windsor does not argue that Windsor's claim meets the elements of promissory estoppel. Instead, Windsor states that the only way to avoid injustice is for the Court to allow Windsor to recover under a theory of promissory estoppel. Windsor cites *Grunstein v. Silva*,[80] which states "[a]lthough promissory estoppel is often invoked as a substitute for consideration or to avoid the statute of frauds, the principal question in Delaware

---

[77] *Grunstein v. Silva*, 2009 WL 4698541, at *7 (Del. Ch. Dec. 8, 2009).
[78] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1233 (Del. Ch. 2000).
[79] 67 A.3d 330, 348 (Del. 2013).
[80] 2011 WL 378782, at *11 (quoting *Grunstein*, 2009 WL 4698541, at *7).

22

promissory estoppel cases is 'whether injustice could be avoided only by enforcement of the promise.'"

*Grunstein v. Silva* does not state that a court will consider injustice in lieu of the elements of a promissory estoppel claim enumerated above. Windsor has not shown, with more than conclusory statements, that the Defendants promised to affirm Windsor's acceptance to buy the Loan for $5.3M without rigorous review from the creditors' committee or that the creditors' committee's approval was implicit. Instead, the Defendants made a conditional offer, which does not meet the requirements for a definite and certain promise sufficient to sustain a claim for promissory estoppel.

Second, Windsor has not shown that it was the reasonable expectation of the Defendants to induce Windsor to action. Windsor's sole argument is that the parties only allotted a thirty-day window for closing, so Windsor had to obtain funding from its lender to buy the Loan in order to meet the closing deadline. But, the fact that the creditors' committee had not approved the sale suggests that Windsor had no reason to believe it would obtain the Loan.

Third, Windsor has not shown that Windsor *reasonably* relied on the Defendants' alleged promise to affirm the Acceptance. A reasonable person would likely understand the condition that the Offer and Acceptance were subject to the creditors' committee's approval to mean that the parties did not have a valid contract until the creditors' committee had given its approval. Also, the terms of the PNA specifically state that the parties may not rely on the representations that the parties' make in their negotiations regarding the sale of the Loan. So, even if the Defendants had promised Windsor to sell Windsor the Loan, Windsor could not have relied on this promise.

Lastly, Windsor has not shown that the Court would create injustice by preventing Windsor to recover. Parties often incur costs in bidding for an asset such as research costs to assess the appropriate amount for a bid and to obtain financing. But, the fact that bidding parties incur costs does not mean that the deciding party has created an injustice by not granting the asset to each bidding party.

## V. CONCLUSION

For all the foregoing reasons, the Court **GRANTS** the Motion.

**IT IS SO ORDERED.**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:    File&ServeXpress